**In re: George SCHMITZ, Debtor.**

**219.** *Bernal,* 204 F.3d at 927–28.

**220.** *Cf. id.* at 927; *see also* Fed.R.Evid. 403.

William C. Sliney, Appellant,

v.

Kenneth W. Battley, Trustee; George Schmitz, Appellees.

No. 00–35075.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 9, 2001

Filed Oct. 16, 2001

**221.** *Beachy v. Boise Cascade Corp.,* 191 F.3d 1010, 1013 (9th Cir.1999), *cert. denied,* 529 U.S. 1021, 120 S.Ct. 1425, 146 L.Ed.2d 316 (2000).

Robert P. Crowther, Anchorage, Alaska, for the appellant.

William D. Argus, Anchorage, Alaska, for the appellee.

Before: SCHROEDER, CHIEF Judge, T.G. NELSON and SILVERMAN, Circuit Judges.

SILVERMAN, Circuit Judge:

*"Nothing is more ungainly than a fisherman pulled into the water by his catch."*

—*Louis Nizer*, My Life in Court

## I. Introduction

A fisherman filed for bankruptcy a year-and-a-half *before* the Secretary of Commerce promulgated regulations creating post-filing fishing quota rights based on the fisherman's pre-filing catch history. We hold that these quota rights were not property of the bankruptcy estate because: (1) the regulations did not exist at the time the debtor filed his petition; and (2) although the quota rights were calculated on the basis of the debtor's pre-filing fishing history, they govern his post-filing right to fish.

## II. Facts

George Schmitz fished for halibut and sablefish off of the coast of Alaska in 1988 through 1990.

In April, 1992, Schmitz filed a Chapter 7 bankruptcy petition. At that time and for at least seven years prior, the North Pacific Fisheries Management Council, an agency of the Department of Commerce, had been considering the implementation of a quota-based fisheries management plan for halibut and sablefish caught off of the Alaskan coast. Proposed regulations to create a fishery management plan were in various stages of administrative gestation when Schmitz filed his Chapter 7 petition; however, the plan had not yet been adopted and there was no assurance that it ever would be. Schmitz did not list on his bankruptcy schedule "potential fishing rights" or anything to that effect.

On November 9, 1993, *some nineteen months after Schmitz filed his bankruptcy petition,* the Secretary of Commerce published the final regulations to implement the Alaska halibut and sablefish fish management plan. 58 Fed.Reg. 59,375 (Nov. 9 1993) (to be codified at 50 C.F.R. Parts 204, 672, 675 and 676). The regulations became effective on January 1, 1994.[1] *Id.* at 59,376. As finally implemented, the plan called for qualified fishermen to apply for and be awarded Quota Shares ("QS") and Individual Fishing Quotas ("IFQ"), an annual catch limit applicable to *future* fishing, based on the total weight of a fisherman's legal landing of sablefish and halibut during the so-called "qualifying years" of 1988–1990. 50 C.F.R. § 676.20(b) (1994).

In late 1993 or early 1994, QS/IFQ application forms were mailed to fishermen. Schmitz filed his QS/IFQ application in

---

1. The final regulations became effective in three stages—on December 9, 1993, January 1, 1994 and January 1, 1995. 58 FR 59375, 59376. The regulations relevant to this decision, §§ 676.20 and 676.21, became effective on January 1, 1994. *Id.*

1994. Hugh Wisner, who leased fishing vessels to Schmitz, filed a competing application. Both were given notice of the existence of the competing applications in March, 1995 and both were given an opportunity to provide additional information in support of their respective claims to the disputed fishing rights. They each submitted additional documentation. On June 14, 1995, the National Marine Fisheries Commission issued an "Initial Administrative Determination" in favor of Schmitz. Wisner appealed, but the initial ruling was upheld by an appeals officer with the Office of Administrative Appeals of the National Marine Fisheries Service, Alaska Region, in October, 1996.

At last, in December 1996, over four and one-half years after Schmitz filed his bankruptcy petition, he was issued two QS/IFQ certificates for 41,478 units and 1,815 units of halibut, respectively.

In January 1997, Schmitz, with the approval of the National Marine Fisheries Service, conveyed the larger QS/IFQ to Appellant William Sliney in exchange for some crab pots. Sliney resold that QS/IFQ to a third party for $44,360.50. Schmitz sold the smaller QS/IFQ to a third party for $2,205.00.

In June, 1997, the bankruptcy trustee filed adversary proceedings seeking a declaration that the QS/IFQs were property of the estate, and to recover $2,205.00 from Schmitz and $44,360.50 from both Sliney and Schmitz. The trustee also sought to revoke Schmitz's bankruptcy discharge. As described by the bankruptcy judge in his thoughtful ruling on cross-motions for summary judgment, the "adversary proceeding presents a close issue which the courts have rarely, if ever, addressed—the implementation of a postpetition law giving life to prepetition qualifying or enabling events." The bankruptcy judge ruled that in light of the "ongoing federal activity to implement" a sablefish management plan

"and the advanced stage in bringing that to fruition" at the time Schmitz filed his bankruptcy petition—even though the plan had not yet been adopted—"the IFQ/QSs were tied to Schmitz's prepetition qualifying rights from the 1988–1990 fishing seasons. The IFQ/QS rights were 'rooted' in Schmitz's prebankruptcy past." The bankruptcy court accordingly granted partial summary judgment for the trustee. It held that the QS/IFQs were property of the bankruptcy estate and it revoked Schmitz's discharge. The Bankruptcy Appellate Panel (BAP) affirmed in an unpublished decision, which Sliney now appeals.

### III. Standard of Review

■ We have jurisdiction to review the final decision of the BAP pursuant to 28 U.S.C. § 158(d). We review the decision of the BAP de novo, *In re Scovis,* 249 F.3d 975, 980 (9th Cir.2001), and independently review the bankruptcy court's rulings. *In re Sheehan,* 253 F.3d 507, 511 (9th Cir. 2001). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *In re P.R.T.C., Inc.,* 177 F.3d 774, 782 (9th Cir. 1999).

### IV. Analysis

**A. The QS/IFQs were not property of the bankruptcy estate because the regulations creating them were not adopted until after the bankruptcy petition was filed.**

■ The issue in this case is whether the QS/IFQs were property of Schmitz's bankruptcy estate as of April 7, 1992, the date on which Schmitz filed his bankruptcy petition, even though the administrative regulations creating them had not yet been adopted. We hold that they were not. The Bankruptcy Code defines "property of the [bankruptcy] estate" as "all legal or equitable interests of the debtor in proper-

ty *as of the commencement of the case."* 11 U.S.C. § 541(a)(1) (emphasis added). We look to federal regulation to determine the nature and extent of the fishing rights because the QS/IFQs were created and extensively defined by federal regulation. *In re Simplified Info. Systems.,* 89 B.R. 538, 541–42 (W.D.Pa.1988) (applying federal copyright law to determine if a software design was property of the estate); *cf. In re Central Arkansas Broad. Co.,* 68 F.3d 213, 214–15 (8th Cir.1995) (holding that an FCC license, that was transferable pursuant to federal statute, was property of the estate); *In re Braniff Airways, Inc.,* 700 F.2d 935, 942 (5th Cir.1983) (applying FAA regulations to find that landing slots are not property of the estate but are restrictions on use of property).

On April 7, 1992, the QS/IFQ program had not yet been adopted. Rather, the regulations did not come into effect until January 1, 1994. 58 Fed.Reg. at 59376. Although the program was under consideration at the time Schmitz filed his petition, the Secretary of Commerce had not yet received the North Pacific Fishery Management Council's formal recommendation to implement a QS/IFQ program to limit open fishing. The Secretary did not receive the formal recommendation until October 26, 1992. 58 Fed.Reg. at 59376. The Secretary did not publish notice of the proposed regulations until almost seven months after Schmitz filed his petition. The final rules were not published until nineteen months after Schmitz initiated his bankruptcy. *See* Notice of Availability of Amendments to Fishery Management Plans, 57 Fed.Reg. 49,676 (November 3, 1992); 57 Fed.Reg. 57,130 (proposed December 3, 1992) (to be codified at 50 C.F.R. pts. 672, 675 and 676); 58 Fed.Reg. 59,375 (November 9, 1993) (to be codified at 50 C.F.R. pts. 672, 675 and 676).

The whole point of publishing notice of proposed regulations is to provide an op-portunity for comment, objection, and further consideration before a final decision is made about whether or not to implement them. Any number of legal, political or bureaucratic factors can affect whether mere proposals ever ripen into full-fledged regulations. Rule-making is like baseball: It ain't over 'til it's over. On the date that Schmitz filed his petition, he might have had a hope, a wish and a prayer that the Secretary would eventually implement the plan then under consideration. However, the fact remains that as of the date of the petition, Schmitz's 1988–1990 catch history had no value. At most, there existed the possibility that his prior catch record *might* be relevant *if* a fishing quota program were ever adopted in a form favorable to him, *if* his application for such rights were granted, and *if* he could successfully defend against any competing challenge to his application. This sort of nebulous possibility is not property.

Our conclusion is in accord with the one reached by the Eighth Circuit Bankruptcy Appellate Panel in a very similar situation. In *In re Vote,* 261 B.R. 439, 444 (8th Cir.BAP April 25, 2001), a farmer filed for bankruptcy protection in September, 1999. About six weeks later, Congress enacted legislation creating crop disaster and assistance programs that entitled the farmer to payments for pre-filing crop years. The farmer received payments totaling approximately $30,000.00. The issue was whether these payments, made and received pursuant to legislation enacted post-petition, for crop losses occurring pre-petition, were property of the estate. The Eighth Circuit BAP held that they were not.

> [T]he fact that in this instance there was a date certain as to when the Debtor became legally entitled to the [crop disaster and assistance] payments—a date that was clearly postpetition—those payments cannot be considered property of the bankruptcy estate under 11 U.S.C.

§ 541(a)(1). As of the date the Debtor filed his bankruptcy petition, he may have had, at most, an expectation that Congress would enact legislation authorizing crop disaster or assistance payments to farmers affected by weather conditions in 1999, but there was no assurance that Congress would authorize such payments or that the Debtor would qualify for them if they were authorized. It was equally likely that Congress would *not* pass such relief legislation. Such an expectancy (or "hope," if you will) does not rise to the level of a "legal or equitable interest" in property such that it might be considered property of the estate under 11 U.S.C. § 541(a)(1).

*Id.* at 444.

Schmitz, the fisherman, is in the same boat. On the date that he filed his bankruptcy petition, he had no more than a hope or expectation that fishing quota regulations would be enacted and that he would qualify for whatever was promulgated. Such an expectation does not rise to the level of property.

**B. The QS/IFQs defined Schmitz's post-filing fishing rights; they were not payment for pre-filing work.**

Schmitz's QS/IFQs were not payments for his pre-filing fishing. They were not a form of deferred compensation or akin to contingency fees received after filing for work performed before filing. *See In re Jess,* 169 F.3d 1204, 1207 (9th Cir.1999) (contingent fee attributable to pre-petition and post-petition work); *In re Ryerson,* 739 F.2d 1423, 1425 (9th Cir.1984) (post-petition contingent payments received pursuant to an employment contract that existed when the petition was filed). Nor were the QS/IFQs similar to pre-petition contracts with contingent clauses. *In re Neuton,* 922 F.2d 1379 (9th Cir.1990) (debtor's right to receive trust income in the event he survives others); *In re Minoco Group of Cos., Ltd.,* 799 F.2d 517, 518 (9th Cir.1986) (pre-petition insurance contract insuring the debtor company against claims made by its officer and directors); *In re Bialac,* 712 F.2d 426, 430–31 (9th Cir.1983) (pre-petition foreclosure right to redeem property). The cases above all involved payments pursuant to binding pre-existing contracts with well-defined contingency provisions. The QS/IFQs are nothing like that.

Schmitz's QS/IFQs, granted after he filed for bankruptcy, were permits or harvesting privileges that governed what Schmitz would be allowed to catch in the post-filing future. *See* 58 F.R. at 59379–80. True, those privileges were *calculated* by reference to Schmitz's pre-filing landings of halibut and sablefish, but so might a debtor's post-bankruptcy salary take into account the debtor's pre-filing education, work experience or performance. Schmitz's 1988–1990 pre-bankruptcy catch history is no different. It merely was used to define the extent of his right to catch fish in the future. It was no more property of the bankruptcy estate than any other work history that positively impacts post-bankruptcy earnings. As the saying goes, everyone has a history. Debtors bring their pre-filing work histories to their post-filing work lives. If we were to hold that Schmitz's right to fish in the post-filing future is property of the bankruptcy estate simply because it is affected by his pre-filing past, we would defeat the salutary purpose of bankruptcy, which is to provide a fresh start from the date of filing.

**V. Conclusion**

We hold that Schmitz's QS/IFQs were not property of the bankruptcy estate on April 7, 1992. Therefore, the decision of the Bankruptcy Appellate Panel is RE-

VERSED and the case REMANDED for further proceedings consistent with this opinion.