PRADO, Circuit Judge:
This is a bankruptcy case. The issue is whether a crop-disaster-relief payment authorized by legislation enacted after the debtor filed for bankruptcy is property of the bankruptcy estate. A panel of this court held that it is not, following which the court voted to consider the case en banc. After hearing argument and considering supplemental briefing by the parties as well as law professors serving as amici curiae,[1] a majority of the court agrees -with the panel decision. Accordingly, we reverse the judgment of the district court.
I.
The facts are short and undisputed. Farmer Edward Keith Burgess filed a Chapter 7 bankruptcy petition in August 2002. He was discharged from bankruptcy in December 2002. In February 2003, the Agricultural Assistance Act of 2003 (“the 2003 Act”) was enacted. That legislation provided for crop-disaster-relief payments to qualifying farmers for 2001 or 2002 crop losses.
Qualifying farmers could begin applying for disaster payments in June 2003. Burgess did so, and in August 2003, after Burgess’s bankruptcy case was closed, the Farm Service Agency of the Department of Agriculture mailed a check for $24,829 to the trustee of Burgess’s bankruptcy estate. The purpose of this payment was to compensate Burgess for crop losses sustained in 2001.
The bankruptcy case was reopened to determine what to do with the check. Burgess filed a Motion for Turnover, which was denied by the bankruptcy court. The district court affirmed, both courts concluding that the payment was property of the bankruptcy estate and belonged to Burgess’s creditors.
A panel of this court reversed. Burgess v. Sikes (In re Burgess), 392 F.3d 782, 786 (5th Cir.2004). The panel reasoned that the disaster payment was not “property” *496 under 11 U.S.C. § 541(a)(1) because the legislation providing for the payment was not enacted until after Burgess filed for bankruptcy. Id. at 786. According to the panel, since Burgess “had no legal or equitable right to [the] payment absent such legislation,” “[he] had no legal or equitable right to [the payment] at the commencement of [his] bankruptcy case.” Id. at 786-87.
The panel also held that the payment was not “proceeds” of property under § 541(a)(6). Id. at 787. Proceeds must derive from property of the estate, and here Burgess had none. Id. Without property, there could not be proceeds. Id. Accordingly, the panel reversed the judgment of the district court. Id.
The court ordered rehearing en banc to determine whether the disaster payment at issue in this case constitutes property within the meaning of § 541(a)(1) or proceeds within the meaning of § 541(a)(6). Holding it is neither, we again reverse the judgment of the district court.
II.
Whether money is property of the debtor or the bankruptcy estate is a question of law reviewed de novo. See State Farm Life Ins. Co. v. Swift (In re Swift), 129 F.3d 792, 795 (5th Cir.1997) (deciding de novo whether legal causes of action belonged to the debtor or to the estate). In this case, two subsections of § 541 potentially bring Burgess’s disaster-relief payment into his bankruptcy estate. Section 541 of the Bankruptcy Code broadly defines “property of the estate” as “all ... property, wherever located and by whomever held.” 11 U.S.C. § 541(a) (2004). Subsection (1) specifies that property of the estate includes “[a]ll legal or equitable interests of the debtor in property as of the commencement of the case.” § 541(a)(1) (emphasis added). Subsection (6) further provides that “proceeds ... of or from property of the estate” also come into the bankruptcy estate. § 541(a)(6).
Thus, the scope of § 541 is broad: that section brings into the estate all of the debtor’s legal and equitable interests “wherever located and by whomever held.” § 541(a)(1). However, the Code also provides a temporal limitation: property of the estate is determined at “[t]he commencement of the case.” Id.[2] The case is commenced, and the estate created, when the bankruptcy petition is filed. See In re Swift, 129 F.3d 792, 795 (5th Cir.1997); 5 Collier on Bankruptcy 541.02 (15th ed. rev.2005). Section 541’s temporal limitation is the key to deciding this case.
III.
The trustee and the amici (collectively, “the Appellees”) argue that Burgess’s disaster-relief payment comes into the bankruptcy estate through a combination of § 541(a)(1) (property) and § 541(a)(6) (proceeds). Specifically, they advance the following arguments to support the inclusion of the disaster-relief payment in Burgess’s bankruptcy estate. First, they argue that Burgess’s crop loss gave him a contingent interest in the postpetition disaster-relief payment. As such, they claim that the contingent interest constitutes property of the estate, making the disaster-relief payment proceeds of that property. Second, the Appellees argue that Burgess’s crop loss, itself, is property of the estate supporting the inclusion of the pay *497 ment as proceeds under a straightforward application of § 541(a)(1) and (a)(6).
Because the Bankruptcy Code defines property of the estate in terms of “legal or equitable interests of the debtor” that exist “as of the commencement of the case,” id. § 541(a)(1), the question we must decide is temporal: when did Burgess acquire a legal interest in the disaster-relief payment? In other words, did the crop loss itself entitle Burgess to the money? Or was it the combination of Burgess’s crop loss and the enactment of the 2003 Act that gave him that interest? If it was the former, then Burgess acquired the interest before bankruptcy, and the payment is part of his estate. But if it was the latter combination of events that gave Burgess an interest in the payment, he did not acquire that interest until after bankruptcy; and the disaster-relief payment belongs to Burgess. For the reasons that follow, we hold it was the latter.
A.
The Appellees first argue that Burgess had a contingent interest in the payment at the time of bankruptcy pursuant to Segal v. Rochelle, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). They claim that this interest is property of the estate, bringing the postpetition payment into the estate as proceeds.
In Segal, the debtors filed for bankruptcy in September 1961. Id. at 376. “After the close of that calendar year, loss-carry-back tax refunds were sought and obtained from the United States on behalf of [the debtors] under Internal Revenue Code § 172.” Id. The losses had been suffered prior to the debtors filing for bankruptcy in September 1961; they were carried back to the years 1959 and 1960 to offset net income earned in those' years. Id. The question before the Supreme Court was whether this refund was property of the bankruptcy estate under § 70a(5) of the Bankruptcy Act,[3] the predecessor to § 541(a)(1) of the Bankruptcy Code. Id.
“Property,” as used in § 70a(5), was not defined in the Bankruptcy Act;[4] therefore, according to Segal, the dual purposes of the Bankruptcy Act governed the definition of property under pre-Code law. See id. at 379, 86 S.Ct. 511. The first goal of the Bankruptcy Act was “to secure for creditors everything the bankrupt may possess ... when he files his petition.” Id. To achieve that goal, property was construed to include interests that are novel, contingent, or the enjoyment of which must be postponed. Id. The second goal of the Act was to “leave the bankrupt free after the date of his petition to accumulate new wealth in the future.” Id. The inquiry under; this prong was whether the interest was “sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts’ ability ■ to make an unencumbered fresh start that it should be *498 regarded as ‘property’ under § 70a(5).” Id. at 379-80, 86 S.Ct. 511.
The Court held that in light of these considerations, the debtors’ refund was property of the bankruptcy estate. Id. at 381, 86 S.Ct. 511. According to the Court, the first question was whether “on the date the bankruptcy petitions were filed, the potential claims for loss-carryback refunds constituted ‘property.’ ” Id. at 379, 86 S.Ct. 511. The Court answered this question in the affirmative by examining the circumstances that existed “at the time [the] bankruptcy petitions were filed.” Id. at 380, 86 S.Ct. 511. Two circumstances that “point[ed] towards realization of a refund” were that “taxes had been paid on net income within the past three years[ ] and the year of bankruptcy at that point exhibited a net operating loss.” Id. In addition, the tax law that provided for the refund was enacted before the debtor filed for bankruptcy.[5] Thus, at the time of filing, the debtors had a claim for a refund— a legal interest — regardless of when the money was actually paid. See id. at 380, 86 S.Ct. 511. Next, turning to the second prong of the property inquiry, the Court concluded that the debtors’ claim for a refund was indeed rooted in the prebank-ruptcy past and not entangled with their ability to make a fresh start. Id. Accordingly, the Court held that the claim for a refund was property of the bankruptcy estate within the meaning of § 70a(5) of the Bankruptcy Act. Id. at 381, 86 S.Ct. 511.
Because Burgess’s crop loss occurred before bankruptcy, the Appellees argue that the Supreme Court’s “sufficiently rooted” test supports classification of the payment as property of the estate. In other words, they claim that Burgess’s interest in the disaster payment is “sufficiently rooted in [Burgess’s] pre-bankruptcy past and so little entangled with [his] ability to make an unencumbered fresh start that it should be regarded as ‘property’ under [§ 541],” id. at 380, 86 S.Ct. 511. We reject this argument for two reasons.
First, although Congress has specifically approved of Segal’s result,[6] Segal’s “sufficiently rooted” test did not survive the enactment of the Bankruptcy Code. As this court previously explained in Goff v. Taylor,
The Bankruptcy Code was intended to create a more uniform and comprehensive scope to “property of the estate” which is subject to the reach of debtors’ creditors than had previously existed under the old Bankruptcy Act. Under Section 70(a) of the earlier Act, the inclusion of an asset within the estate varied in accordance with (1) an individual examination of the legal nature of the asset (2) in light of the purposes of the Bankruptcy Act. This two part test reflected the dual and often conflicting policies woven into the Act. These policies were to secure for the benefit of creditors everything of value the bankrupt might possess in alienable or levia-ble form, but to permit a bankrupt to accumulate new wealth after the date of his petition and to allow him an unen *499 cumbered fresh start. Relying upon these competing considerations, the Supreme Court developed a rule that where property “is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts’ ability to make an unencumbered fresh start ... it should be regarded as ‘property’ [of the estate].”

The enactment of the Bankruptcy Code undertook to obviate this analytical conundrum. Under Section 511 of the Code, all property in which the debt- or has a “legal or equitable interest” at the time of bankruptcy comes into the estate.

706 F.2d 574, 578 (5th Cir.1983) (internal citations and footnotes omitted) (emphasis added), overruled on other grounds by Patterson v. Shumate, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Section 541 now governs what is considered property of the bankruptcy estate, and unlike former § 70a(5) of the Bankruptcy Act, § 541 expressly defines property: “All legal or equitable interests of the debtor in property as of the commencement of the case.” 11 U.S.C. § 541. Thus, under current law, a debtor’s interest in property may be contingent — or enjoyment of the interest may be postponed — until after bankruptcy, but the debtor must have had a prepetition legal interest nonetheless.
Second, Segal is distinguishable because the debtor did have a prepetition legal interest in that case. At the time of bankruptcy, § 172 of the Internal Revenue Code gave the debtor a claim for a tax refund if certain conditions were met. It was the combination of the law and the conditions made legally relevant by the law that conferred on the debtor a prepetition legal interest: the claim for a refund. In that way, the Segal debtors’ claim for a refund is similar to the prepetition accrual of a cause of action that results in a post-petition judgment in the debtor’s favor. In such cases, the debtor’s cause of action is a prepetition legal interest — § 541(a)(1) property — that brings the postpetition judgment into the estate as proceeds under § 541(a)(6). See, e.g., Wieburg v. GTE Southwest Inc., 272 F.3d 302, 306 (5th Cir.2001) (holding that causes of action for age and sex discrimination that arose pre-petition were property of the bankruptcy estate).
Here, by contrast, Burgess suffered the crop loss before filing for bankruptcy, but he did not have a prepetition claim to, or interest in, the disaster-relief payment because the legislation authorizing the payment had not yet been enacted. If Burgess had no right or interest that constituted property within the meaning of § 541(a)(1) at the commencement of the case, then the payment he later received cannot be proceeds of property of the estate under § 541(a)(6). Two other courts have recently reached the same conclusion in the context of federal disaster-relief payments to farmers.
In In re Vote, the Eighth Circuit distinguished Segal in holding that similar disaster-relief payments were not property of the estate under § 541(a)(1). Drewes v. Vote (In re Vote), 276 F.3d 1024, 1026-27 (8th Cir.2002).[7] The facts of Vote are indistinguishable from this case.
Vote could not plant a crop in 1999 because the soil was . saturated. Id. at 1026. In September 1999, Vote filed a Chapter 7 bankruptcy petition. Id. In *500 October 1999, Congress passed legislation compensating qualifying farmers for 1999 crop losses. Id. The next month, Vote began receiving disaster-relief payments pursuant to this legislation. Id.
The Eighth Circuit rejected the trustee’s argument that the payments were property of the bankruptcy estate under Segal, stating,
Segal is distinguishable.... [Ujnlike the Appropriations Act in the present case, the law authorizing the tax refund predated the bankruptcy filing. Thus, the Segal debtor possessed an existing interest at the time of filing, whereas Vote had a mere hope that his losses might generate future revenue.
The trustee cites a number of cases that follow the rule in Segal. In each of those cases, however, there existed a readily discernible legal interest at the time of filing. Some arose from statutes, some from contracts, and some from lawsuits, but all conferred upon the debtors interests with some potential value, even though those interests may have been only contingent. In contrast, before Congress passed the Appropriations Act, Vote had no interest of any kind.
Id. at 1026-27.
One district court recently followed Vote in a similar case, In re Bracewell,[8] reaching the same result. Braceivell considered whether a disaster payment created by the 2003 Act was property of the estate where the debtor converted his Chapter 12 case to a Chapter 7 case before the legislation was enacted. Id. at 701.[9]
The Bracewell court explained that “once crop disaster legislation is enacted, legally significant facts exist upon which a farmer could base a contingent right, which is the same type of contingent right contemplated under Segal.” Id. at 706-07. However, the mere hope that the legislation will be enacted does not create a contingent interest in the debtor. Id. at 707. The court explained,
Without the crop disaster legislation, growing crops and suffering crop loss ... are of no legal significance and create no right.... Indeed it is the crop disaster legislation that makes growing and suffering certain crop losses relevant by attaching new legal consequences to events completed before the legislation’s enactment. Consequently, this is not the type of contingency contemplated by Segal ....

Id.

The necessity of a prepetition legal interest has also been reaffirmed in post-Segal cases decided in other, comparable contexts. Sliney v. Battley (In re Schmitz), 270 F.3d 1254 (9th Cir.2001), and Hoseman v. Weinschneider, 277 B.R. 894 (N.D.Ill.2002), aff'd on other grounds, 322 F.3d 468 (7th Cir.2003), are two such examples.
The debtor in Schmitz was an Alaskan fisherman of halibut and sablefish. Schmitz, 270 F.3d at 1255. He filed for bankruptcy in April 1992. Id. Seven *501 years prior to Schmitz’s bankruptcy, “the North Pacific Fisheries Management Council, an agency of the Department of Commerce, had been considering the implementation of a quota-based fisheries management plan for halibut and sablefish caught off the Alaskan coast.” Id. Proposed regulations had been promulgated by the time Schmitz filed for bankruptcy, but the final regulations implementing the plan were not published by the Secretary of Commerce until November 1993, nineteen months after Schmitz filed. Id. The regulations became effective in January 1994. Id.
Pursuant to the final regulations, “the plan called for qualified fisherman to apply for and be awarded Quota Shares (‘QS’) and Individual Fishing Quotas (‘IFQ’), an annual catch limit applicable to [future] fishing, based on the total weight of a fishermen’s legal landing of sablefish and halibut during the so-called ‘qualifying years’ of 1988-1990.” Id. (citing 50 C.F.R. § 676.20(b) (1994)). Schmitz filed his QS/ IFQ application in 1994, but his QS/IFQ allotment did not become final until 1996. Id. at 1255-56. “At last, in December 1996, over four and one-half years after Schmitz filed his bankruptcy petition, he was issued two QS/IFQ certificates for 41,-478 units and 1,815 units of halibut, respectively.” Id. at 1256.
In January 1997, Schmitz “conveyed the larger QS/IFQ to Appellant William Sliney in exchange for some crab pots.” Id. Sli-ney then resold the allotment to a third party for approximately $44,000. Id. Schmitz also sold the smaller allotment to another party for approximately $2,000. Id.
In June 1997, the trustee sought to reopen Schmitz’s bankruptcy proceeding, claiming that the QS/IFQ allotments were property of the estate and seeking to recover the $2,000 from Schmitz and $44,000 from Sliney. Id. The bankruptcy court agreed that the allotments were property of the estate and awarded the money to the trustee:
The bankruptcy judge ruled that in light of the “ongoing federal activity to implement” a sablefish management plan “and the advanced stage in bringing that to fruition” at the time Schmitz filed his bankruptcy petition — even though the plan had not yet been adopted — “the IFQ/QSs were tied to Schmitz’s prepetition qualifying rights from the 1988-1990 fishing seasons. The IFQ/QS rights were ‘rooted’ in Schmitz’s pre-bankruptcy past.”
Id. The Bankruptcy Appellate Panel affirmed the bankruptcy court’s grant of partial summary judgment in favor of the trustee. Id.
The Ninth Circuit reversed, holding that the QS/IFQ allotments “were not property of the bankruptcy estate because the regulations creating them were not adopted until after the bankruptcy petition was filed.” Id. The Schmitz court began its analysis as we did in this case, by looking to the Bankruptcy Code’s definition of property of the estate: “all legal or equitable interests of the debtor in property as of the commencement of the case.” Id. at 1256-57 (quoting 11 U.S.C. § 541) (emphasis in original). The court determined that Schmitz did not have a property interest in the QS/IFQs on the date of bankruptcy, explaining,
On the date that Schmitz filed his petition, he might have had a hope, a wish and a prayer that the Secretary would eventually implement the plan then under consideration. However, the fact remains that as of the date of the petition, Schmitz’s 1988-1990 catch history had no value. At most, there existed the possibility that his prior catch record might be relevant if a fishing quota pro *502 gram were ever adopted in a form favorable to him, if his application for such rights were granted, and if he could successfully defend against any competing challenge to his application. This sort of nebulous possibility is not property.
Id. The Schmitz court then discussed and approved of the Eighth Circuit’s decision in Vote, observing, “Schmitz, the fisherman, is in the same boat [as the debtor in Vote].... [Neither’s] expectation [rises] to the level of property.” Id.
The district court in Hoseman v. Weinschneider also confirmed the necessity of a prepetition legal interest. Weinschneider, 277 B.R. at 900-01. In that case, during September and October of 1989, the debtor, Henry Weinschneider, negotiated an arrangement with two other parties whereby the parties would form a business entity called Burton to operate nursing homes. Id. at 897. According to the agreement, the debtor would own 23% of Burton and would receive a share of any profits made by the nursing homes. Id. In exchange, the debtor would continue his efforts to obtain business for Burton and teach the other parties how to operate nursing homes. Id. Weinschneider filed for bankruptcy on October 10, 1989. Id. Burton was incorporated on October 19, 1989. Id.
Weinschneider was never compensated by Burton, and in February 1996, he filed a state-court breach-of-contract action against the other parties to the agreement. Id. at 898. The trustee brought an action in bankruptcy court, seeking to have the breach-of-contract action declared property of the bankruptcy estate. Id. The bankruptcy court agreed. Id.
The bankruptcy court “reasoned that the deal with Burton was a continuation of [the debtor’s] pre-bankruptcy business, and so the state court suit [was] significantly related to [the debtor’s] pre-bank-ruptcy activities, i.e., the matters giving rise to the state court suit [were] rooted in [his] pre-bankruptcy past.” Id. at 899 (internal quotation marks omitted). The bankruptcy court “did not hold that the contract was formed before the petition was filed, ... only that [the debtor] participated in negotiations leading to its formation before filing.” Id.
The district court reversed. Id. at 902. The court first found that for summary judgment purposes, the contract was formed after Weinschneider filed for bankruptcy. Id. at 900. Moreover, the bankruptcy court had erred in “applying the Segal ‘rooted in the pre-bankruptcy past’ doctrine directly without consideration of whether there was a contract.” Id. Furthermore, neither “mei*e negotiations” nor “merely carrying on one’s normal business activities as if one were not going to declare bankruptcy or had not declared bankruptcy create a pre-petition right to any property.” Id. at 901. The district court further explained the role of the contract this way:
Without a contract, there would be no prospect of any interest in a breach of contract case that had to be disclosed, and without the claim that there was a contract to breach, there would be no state court action to roll into the bankruptcy estate. Without the contract, whether it was pre-petition or post-petition, the negotiations on which the bankruptcy court bases its conclusions would by themselves have no legal effect or relevance. The pre-petition existence of the contract was crucial.
Id. Because Weinschneider filed for bankruptcy before the contract was formed, then, he had no prepetition cause of action that could be part of the bankruptcy estate. Id. Consequently, the judgment of *503 the bankruptcy court was reversed. Id. at 902.
We agree with the analyses of the Vote, Bracewell, Schmitz, and Weinschneider courts. In this case, at the time of filing, Burgess had only a mere hope that crop-disaster-relief legislation would be enacted. “This sort of nebulous possibility is not property.” Schmitz, 270 F.3d at 1257. Were the law otherwise, any postpetition legislation or contract could retroactively create property of the estate. That cannot be the law; § 541 clearly states that a bankruptcy estate is established at “[t]he commencement of [the] case.” Thus, Burgess had no interest, contingent or otherwise, in the disaster-relief payment when he filed his bankruptcy petition.
B.
The Appellees also argue that Burgess’s crop loss, itself, is § 541(a)(1) property supporting the inclusion of the disaster-relief payment in the estate as proceeds under § 541(a)(6). We reject this argument.
Section 541(a)(1) defines property in terms of a legal or equitable interest in property that exists at the commencement of the case. § 541(a)(1). For the temporal limitation to have any meaning at all, Burgess must have had a prepetition interest in the disaster-relief payment, not the crop loss. Were Burgess’s crop loss itself enough to bring the payment into the estate — notwithstanding the postpetition enactment of the 2003 Act, creating Burgess’s right to the payment — the “as of the commencement of the case” language would have no force or effect. “[A] statute must, if possible, be construed in such fashion that every word has some operative effect.” United States v. Nordic Village Inc., 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (quoting Hoffman v. Conn. Dep’t of Income Maint., 492 U.S. 96, 103, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989)).
Furthermore, as the Eighth Circuit said in Vote, “[w]e have found no case in which a pure loss with no attendant potential benefit was included as property of the estate.” Vote, 276 F.3d at 1027. The cases cited by the Appellees do not hold otherwise.
The Appellees cite Milnor v. Metz, 41 U.S. 221, 16 Pet. 221, 10 L.Ed. 943 (1842), and Williams v. Heard, 140 U.S. 529, 11 S.Ct. 885, 35 L.Ed. 550 (1891), for the proposition that a pure loss is property of the estate. Those cases fail to support the Appellees’ position for two reasons.
First, Milnor and Williams decided in 1842 and 1890, respectively predate the enactment of the current Bankruptcy Code by approximately 100 years.[10] The language of the Code is our starting point today, and we find the cases interpreting § 541 more persuasive than those predating its enactment.
Second, Milnor and Williams stand for the proposition that a prepetition loss is property of the estate if it gives rise to a prepetition legal claim or interest. In this case, Burgess’s crop loss, in and of itself, did not give him a legal claim to, or interest in, the disaster-relief payment.
Milnor v. Metz involved a debtor who was an employee of the U.S. government and whose compensation was fixed by statute. Milnor, 41 U.S. at 221. Between 1836 and 1837, Milnor worked overtime or performed services that went beyond those in his job description. Id. Milnor filed for bankruptcy in 1838; he was discharged the following year. Id. at 221-22. In 1840, *504 Congress enacted a law compensating Mil-nor for the extra work he had performed between 1836 and 1837. Id. at 221.
The Supreme Court contrasted Milnor’s situation with that in Emerson’s v. Hall, 38 U.S. 409, 13 Pet. 409, 10 L.Ed. 223 (1839). Milnor, 41 U.S. at 225-26. Emerson, the surveyor of the Port of New Orleans, sued a slave ship, claiming half of its proceeds and cargo. Id. at 225. Although a lower court found in favor of Emerson, its judgment was reversed by the Supreme Court, which held that Emerson “had no right as [a] eaptor[]; and that [he] stood on the footing of an officer who made a military seizure.” Id. After Emerson’s death, Congress “passed an act bestowing on his legal representatives[ ] ... the one-half of the condemnation money.” Id.
Hall, a creditor of Emerson, sued the heirs’ guardian for repayment of the debt out of the money awarded by Congress. Id. The Supreme Court ruled in favor of the heirs, holding that the “act of congress gave the money to Emerson’s heirs[ ] as a gratuity[ ] because of the meritorious conduct of their father.” Id. at 226. The Court explained that Emerson had “acted under no law, nor by virtue of any authority; his acts imposed no obligation, either in law or in equity, on the government.” Id. (internal quotation marks omitted).
By contrast, the Milnor Court stated, “[t]he services performed by Milnor were at the instance of the government....” Id. The government was therefore Mil-nor’s debtor. Id. Although the repayment of the debt was within Congress’s discretion, the debt existed nonetheless. See id. at 226-27. The Court explained that “[h]ad a similar claim on the part of Milnor existed against an individual, instead of the government, then there can be no doubt, he could have recovered by suit.” Id. at 227. “As the government was equally bound to do its debtor justice, in a different mode, with an individual, we think no sound distinction exists in the two cases.” Id. In other words, even though Milnor could not sue the government for the amount of the debt, the debt still existed.
Because Milnor was a creditor of the government, his case is distinguishable from Burgess’s. In Milnor, the government was legally obligated to repay its debt to the bankrupt, even if actual payment was ultimately within Congress’s discretion because the government could not be sued. In other words, sovereign immunity is not a bar to the existence of a prepetition cause of action for bankruptcy purposes. But unlike Milnor, whose claim for services was against the government, Burgess did not have a prepetition claim against the government for his crop loss. Burgess was not a creditor of the government, and Congress had no obligation to pass crop-disaster-relief legislation. Rather, the disaster-relief payments were gratuitous; thus, this case is like Emerson’s, not Milnor.
The other Supreme Court case discussed by the Appellees, Williams v. Heard, 140 U.S. 529, 11 S.Ct. 885, 35 L.Ed. 550 (1891), is similarly distinguishable. There, the debtors insured ships that were damaged in the Revolutionary War. See id. at 529-30, 11 S.Ct. 885. They became bankrupt in 1875; they were discharged from bankruptcy in 1877. Id. at 530, 11 S.Ct. 885.
In 1871, an arbitration tribunal in Geneva awarded the United States $15,500,000 as indemnity for property damage sustained by U.S. citizens during the war. Id. at 536-37, 11 S.Ct. 885. In 1882, a congressional act created the Court of Commissioners of Alabama Claims to adjudicate claims and distribute the money. Id. at 531, 11 S.Ct. 885. The issue before the Supreme Court was whether the claim for *505 reimbursement preceded the debtors’ bankruptcy or was not cognizable until the passage of the Act of 1882, which created the court that distributed the money. Id. at 540, 11 S.Ct. 885.
The Court held that the claim existed before bankruptcy and was therefore property of the estate, noting,
[T]hese war premiums of insurance were recognized by the government of the United States as valid claims for which satisfaction should be guarantied [sic]. There were thus at all times a possibility that the government would see that they were paid. There was a possibility of their being at some time valuable. They were rights growing out of property; rights, it is true, that were not enforceable until after the passage of the act of congress for the distribution of the fund. But the act of congress did not create the rights. They had existed at all times since the losses occurred. They were created by reason of losses having been suffered. All that the act of congress did was to provide a remedy for the enforcement of the right.
Id. at 541, 11 S.Ct. 885 (emphasis added). The Appellees claim this passage stands for the proposition that a pure loss constitutes property of the estate. Yet that interpretation cannot be reconciled with the facts. In Williams, the debtors were entitled to compensation because they insured property that was damaged by Great Britain; that is, the debtors had a legal claim against someone. If Burgess’s crops had been damaged by an individual, he would have had a legal claim against that person, which would have been considered property of the estate. But they were not. To the contrary, Burgess’s crops were damaged by an act of nature, and thus he had no claim against anyone.
This interpretation is buttressed by the Williams Court’s reliance on Comegys v. Vasse, 26 U.S. 193, 1 Pet. 193, 7 L.Ed. 108 (1828). In that case, Vasse was an insurer of ships owned by U.S. citizens that were captured by Spain. Williams, 140 U.S. at 542, 11 S.Ct. 885. Vasse paid the losses arising prior to 1802; in 1802 he became bankrupt. Id.
In 1819, the United States and Spain entered into a treaty, pursuant to which Spain paid the United States $5,000,000 “in full discharge of the unlawful seizures which she had made.” Id. at 542, 11 S.Ct. 885. Vasse was awarded $8,000 from the fund for payments he had made to the insureds. Id. The Supreme Court held that the money belonged to the estate because Vasse’s claim had existed before bankruptcy. Id. at 542-43, 11 S.Ct. 885. According to the Court,
It is not universally, though it may ordinarily be, one test of a right, that it may be enforced in a court of justice. Claims and debts due from a sovereign are not ordinarily capable of being so enforced. Neither the king of Grant [sic] Britain nor the government of the United States is suable in the ordinary courts of justice for debts due by either; yet who will doubt that such debts are rights?
Williams, 140 U.S. at 543, 11 S.Ct. 885 (quoting Vasse, 26 U.S. at 216).
Milnor, Williams, and Vasse, then, all involved debtors who were creditors of the government or who suffered property loss that gave rise to a legal claim. Their claims were contingent in the sense that they depended on the goodwill of the governments involved for satisfaction, but they were cognizable legal claims nonetheless. By contrast, Burgess had no legal claim arising from his damaged crops when he filed his petition. Unlike the debtors in Milnor and Basse, he was not a creditor of the government. And unlike the debtor in Williams, his property was not damaged at the hands of an individual *506 or entity giving rise to a legal claim for reimbursement. His crops were damaged by nature; thus, the 2003 Act conferred on Burgess both the right and the remedy. Cf. Williams, 140 U.S. at 541, 11 S.Ct. 885 (“All that the act of congress did was to provide a remedy for the enforcement of the right.”) Because the Act was passed postpetition, it does not give rise to a claim that constitutes property of the estate, and the payment made pursuant to it is therefore not proceeds.
IV.
We are likewise unpersuaded by those bankruptcy and district-court cases cited by the Appellees holding that erop-disas-ter-relief payments are property of the bankruptcy estate. The Appellees principally rely on four such cases: Kelley v. Ring (In re Ring), 169 B.R. 73 (Bankr.M.D.Ga.1993); Boyett v. Moore (In re Boyett), 250 B.R. 817 (Bankr.S.D.Ga.2000); Lemos v. Rakozy (In re Lemos), 243 B.R. 96 (Bankr.D.Idaho 1999); and FarmPro Services, Inc. v. Brown (In re FarmPro Services, Inc.), 276 B.R. 620 (D.N.D.2002). Each of these cases is distinguishable or analytically flawed.
In both Ring and Boyett, for example, the statute authorizing the disaster-relief payments was enacted before the debtor filed for bankruptcy.[11] Thus, in those cases, the debtor obtained a prepetition right to the payments that became part of his bankruptcy estate; the actual payments received were therefore proceeds of that right.
Lemos is weak authority for the Appel-lees’ position. In that case, the bankruptcy court held that disaster-relief payments were property of the estate under both § 541(a)(1) and § 541(a)(6) even though the statute authorizing the payments was not enacted until after the debtor filed for bankruptcy. Lemos, 243 B.R. at 97, 101. As the Bracewell court explained, however, Lemos’s analysis is flawed for several reasons. See Bracewell, 322 B.R. at 706-08.
First, Lemos relied heavily on the bankruptcy court’s decision in In re Schmitz, 224 B.R. 117 (Bankr.D.Alaska 1998), which was later reversed by the Ninth Circuit, Sliney v. Battley (In re Schmitz), 270 F.3d 1254 (9th Cir.2001). Bracewell, 322 B.R. at 706; Lemos, 243 B.R. at 99.
Second, the Lemos court’s reasoning is not persuasive. In holding that the debtor had a contingent interest in the disaster payments, the court reasoned as follows:
[I]n this case Plaintiff became entitled to the [disaster-relief] payments only as a result of qualifying events (i.e., growing and suffering qualifying losses as to certain crops) occurring before bankruptcy, rather than any significant event taking place after filing his bankruptcy petition. The scenario is a common one. Congress frequently and regularly enacts a variety of farm subsidy programs, including price supports, set-asides, and disaster relief, which change from year to year. The prospect of a federal program being adopted to compensate for farm losses in any given year may therefore be properly characterized as a contingent interest, which, though it may never vest if the program does not encompass a particular crop or a particular year, is property of the bankruptcy estate when it relates to prepetition crops.
Lemos, 243 B.R. at 99. The Bracewell court asserted, and we agree, that the Lemos court’s contingent-interest analysis is flawed because it conflates “the contingency of receiving crop disaster payments *507 once authorizing legislation is enacted[] [with] the mere hope that such legislation will be enacted in the first place.” Bracewell, 322 B.R. at 706. Bracetvell explained that “once crop disaster legislation is enacted, legally significant facts exist upon which a farmer could base a contingent right, which is the same type of contingent right contemplated under Segal.” Id. at 706-07. However, the mere hope that the legislation will be enacted does not create a contingent interest in the debtor. Id. at 707. Were that the case, any postpetition legislation or contract could retroactively create property of the estate. To the contrary, § 541 clearly states that a bankruptcy estate is established at “[t]he commencement of [the] case.”
Lemos’s contingent-interest analysis is problematic for another reason not discussed by the Bracewell court. Lemos discusses two contingent-interest cases before concluding that the debtor’s right to relief payments constituted a contingent interest: In re Ryerson, 739 F.2d 1423 (9th Cir.1984), and In re Shaw Construction, Inc., 92 I.B.C.R. 90 (Bankr.D.Idaho 1991). Lemos, 243 B.R. at 98-99. Yet in both of those cases, there was a prepetition contract giving rise to the debtor’s interest. See id.[12] Lemos’s reliance on those cases, therefore, is misplaced.
Lastly, the Appellees rely on FarmPro Services, Inc. v. Brown (In re FarmPro Services, Inc.), 276 B.R. 620 (D.N.D.2002) to support their case. FarmPro relied exclusively on Lemos in holding that crop-disaster-relief payments authorized by legislation enacted after the debtor filed for bankruptcy are property of the bankruptcy estate under § 541(a)(6). Id. at 624. As discussed above, however, we are not persuaded by Lemos.[13]
Instead, we follow the lead of the Eighth Circuit in Vote and hold that Burgess did not obtain a legal interest in the disaster-relief payment until the 2003 Act was passed. At the commencement of his bankruptcy case, Burgess had only a mere hope that the legislation would be enacted. A hope will not suffice under § 541.
V.
Finally, the Appellees contend that using the effective date of the 2003 Act, *508 rather than the crop loss itself, as the source of Burgess’s interest in the disaster-relief payment will have disparate results because disaster-relief payments may be treated differently depending on when the debtor files for bankruptcy. They argue that fairness requires us to rule in favor of the trustee.
We decline the Appellees’ invitation to rewrite bankruptcy law. It is Congress who is charged with articulating bankruptcy policy through the Bankruptcy Code; Congress has done so, and we are bound to follow it.[14] The judgment of the district court is therefore REVERSED.
REVERSED and REMANDED.

. The amici are professors Susan Block-Lieb; Ralph Brubaker; S. Elizabeth Gibson; Jonathan C. Lipson; Charles W. Mooney, Jr.; Theresa J. Pulley Radwan; Nancy B. Rapo-port; Robert K. Rasmussen; and Robert M. Zinman. The amici's brief was prepared as a class project in the Bankruptcy LL.M. Program at St. John's University School of Law.

. See also Ohio v. Kovacs, 469 U.S. 274, 285 n. 12, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) ("The commencement of a case under the Bankruptcy Code creates an estate....”); La. World Exposition v. Fed. Ins. Co., 858 F.2d 233, 243 (5th Cir.1988) ("The filing of a petition for reorganization under Chapter 11 of the Code creates an estate.”).

. Section 70a(5) of the Bankruptcy Act read in pertinent part,
(a) The trustee of the estate of a bankrupt ... shall ... be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is property which is held to be exempt, to all of the following kinds of property wherever located ... (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon or sold under judicial process against him, or otherwise seized, impounded, or sequestered....
11 U.S.C. § 110(a)(5) (1964), quoted in Segal, 382 U.S. at 377 n. 1, 86 S.Ct. 511.

. See Segal, 382 U.S. at 379, 86 S.Ct. 511 ("[I]t is impossible to give any categorical definition to the word property.' ” (quoting Fisher v. Cushman, 103 F. 860, 864 (1st Cir.1900))).

. See Drewes v. Vote (In re Vote), 276 F.3d 1024, 1026 (8th Cir.2002) ("[T]he law authorizing the tax refund [in Segal ] predated the bankruptcy fling.”); Bracewell v. Kelley (In re Bracewell), 322 B.R. 698, 704 (M.D.Ga.2005) ("While Segal does not specifically address the issue, it seems as though the tax laws providing for the loss-carryback tax refunds had been enacted prior to the Segal debtor filing his bankruptcy petition.”).

. See 11 U.S.C. § 541 (West 2004) (Historical and Statutory Notes) (Revision Notes and Legislative Reports 1978 Acts) ("The result of [Segal v. Rochelle], is followed, and the right to a refund is property of the estate.”).

. The trustee in Vote did not raise its § 541(a)(6) argument in the district court, and thus the court of appeals refused to consider it. Vote, 276 F.3d at 1027. Although Appellees here do make their Segal argument under § 541(a)(6) (operating in conjunction with § 541(a)(1)), this distinction does not change our analysis of the issue.

. Bracewell v. Kelley (In re Bracewell), 322 B.R. 698 (M.D.Ga.2005).

. The timing of the conversion from Chapter 12 to Chapter 7 was significant in Bracewell because in a Chapter 12 case, § 1207 expands the definition of property of the estate to include § 541-type property that the debtor acquires after the commencement of the case but before the case is closed or converted to a Chapter 7 case. 11 U.S.C. § 1207(a)(1). In this case, Burgess filed his petition under Chapter 7. Chapter 7 contains no comparable provision to § 1207. See 11 U.S.C. §§ 701-900. Thus, here, the critical time remains the date of filing.

. The current Bankruptcy Code was enacted by the Bankruptcy Reform Act of 1978. Bankruptcy Reform Act of 1978, Pub.L. No. 95-598.

. See Ring, 169 B.R. at 74 (statute authorizing payments enacted in December 1991; debtor filed for bankruptcy in January-1992); Boyett, 250 B.R. at 818 (statute authorizing payments enacted in October 1998; debtor filed for bankruptcy in February 1999).

. In Ryerson, for example, the debtor entered into an employment contract in January 1977. Ryerson, 739 F.2d at 1424. The contract gave his employer the option of providing the debtor with compensation upon the termination of his employment if certain conditions precedent were met, e.g., the debtor was an employee in good standing with the company. Id. The debtor filed for bankruptcy in February 1981, and his employment terminated in November 1981, triggering the compensation clause under the contract. Id. The Ninth Circuit held that the prepetition contract had given the debtor a legal interest, though contingent, which was property within the meaning of § 541(a)(1). Id. at 1425. The payments made pursuant to the contract, therefore, were proceeds under § 541(a)(6). Id.
Similarly, in Shaw Construction, "a worker’s compensation insurance dividend which was declared and received postpetition was found to be a contingent interest properly characterized as the property of the bankruptcy estate.” Lemos, 243 B.R. at 99. The insurance contract, however, was entered into before the debtor filed for bankruptcy. See Shaw Construction, 92 I.B.C.R. at 90, 91.

. In addition, as the Bracewell court pointed out, FarmPro reached the right result for the wrong reason. Bracewell, 322 B.R. at 710. The chronology of events in FarmPro is as follows: in September 2000, the debtors filed a Chapter 13 petition; in October 2000, Congress enacted the disaster-relief legislation; in December 2000, the case was converted from a Chapter 13 case to a Chapter 11 case; in June 2001, the debtors converted their case to a Chapter 12; in July 2001, they received the disaster-relief payments. FannPro, 276 B.R. at 623. Thus, the payments were received while the debtor was in Chapter 12. See id. Under § 1207, therefore, the payments are property of the estate. See supra note 10.

. The Bracewell court responded to a similar argument, stating,
[Any] unfairness is largely due to the nature of federally created crop disaster payments, which are in the form of congressionally created retrospective relief. Since this relief — and the possibility of a concomitant windfall to debtors — is a creation of Congress, it should be Congress who must remedy the situation, not the courts by judicial fiat. Congress was well aware of what it was creating when it enacted the crop disaster relief legislation. Congress could have crafted the crop disaster legislation in such a way that encompassed the rights of creditors. It did not. Congress could have added a provision to the Code that specifically classified retrospective government entitlements with regard to property of the estate. It did not. Perhaps it should.
Bracewell, 322 B.R. at 711.