# United States Court of Appeals for the Fifth Circuit

————————

No. 25-20170

————————

United States Court of Appeals
Fifth Circuit

**FILED**

February 3, 2026

Lyle W. Cayce
Clerk

In the Matter of Michele Anita DiBassie,

*Debtor*,

Michele Anita DiBassie,

*Plaintiff—Appellant*,

*versus*

Christopher Reeves,

*Defendant—Appellee.*

————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CV-00247

————————————————————

Before Richman, Engelhardt and Wilson, *Circuit Judges*.

Per Curiam:[*]

Christopher Reeves sued his former business partner, Michele DiBassie, under 11 U.S.C. § 523(a)(4). That bankruptcy statute excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." After a bench trial, the bankruptcy

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-20170

court awarded Reeves a non-dischargeable judgment of $299,980.98. The district court affirmed. DiBassie now appeals, arguing that the district court erred in finding that Reeves had standing to bring his embezzlement claim and that there was ambiguity in the contract. For the reasons explained below, we affirm as to those issues.

## I.

This appeal arises from an adversary proceeding in Michele DiBassie's bankruptcy case. At issue is whether her former business partner Christopher Reeves had standing to pursue a nondischargeability claim and whether the LLC agreement governing their concrete company, SCS Repair Group, LLC (SCS), was ambiguous.

Though its principals are residents of Texas, SCS was formed under the laws of the Commonwealth of Puerto Rico on March 4, 2021.[1] At DiBassie's suggestion, her daughter Emilynn was listed as a member of SCS in the LLC agreement instead of DiBassie; Reeves agreed to this arrangement.[2] The LLC agreement referenced an "Exhibit A" as setting forth the members' capital contributions and ownership interests. The record contains multiple versions of SCS's organizational documents, including differing versions of Exhibit A. The parties dispute whether an agreed Exhibit A existed at the time the LLC agreement was executed and what ownership percentages, if any, were set at that time.[3] The bankruptcy

_____

[1] Some record evidence indicates SCS was formed on February 27, 2021, and other evidence indicates the company was formed March 4, 2021. We use the same formation date as the district court did, and the parties do not debate this question on appeal.

[2] Emilynn was a full-time college student in Galveston, Texas, during 2021 when SCS was formed and when the disputes giving rise to this adversary proceeding arose.

[3] Indeed, little of the parties' dealings was on solid footing. The bankruptcy court stressed that "[t]he facts in this case are highly disputed, and the evidence entered was highly contradictory." And the court concluded that "[n]o named party" had been

court ultimately held, and the district court affirmed, that the controlling version of the LLC agreement contained no attachments, despite the document's reference to "Exhibit A," such that the LLC agreement was ambiguous as to the parties' respective ownership interests.

Day-to-day, DiBassie managed the office, books, billing, and other administrative tasks, while Reeves estimated jobs and handled construction. SCS generated substantial revenue from its projects. Among SCS's initial projects was a job at the United States Custom House in Puerto Rico—worth $2.8 million, with a 40% profit margin. But this promising start soon hardened into bitter disputes between the parties.

In January 2022, Reeves requested job-costing information so that profits could be calculated and distributed. Shortly thereafter, DiBassie informed Reeves that he would not receive distributions—she maintained that he was overpaid—and asserted that he was not a 50% owner of SCS. This angered Reeves, and, as a signatory on SCS's bank account, he wrote himself a check for $24,950.00, for a portion of the money he believed he was due. He deposited that check in his personal bank account. In response, DiBassie revoked Reeves's access to his company email and online accounts, and she removed him as a signatory from SCS's bank account.

From there, the mold was cast. In April 2022, Reeves sued DiBassie and Emilynn in state court. The case ultimately proceeded in the bankruptcy court as an adversary proceeding after DiBassie filed for bankruptcy. In his adversary complaint, Reeves sought a determination that certain debts were nondischargeable under § 523(a)(4). Following a bench trial, the bankruptcy

---

"wholly truthful." In particular, the bankruptcy court had to sift through "numerous documents" that "[DiBassie] forged" and navigate her "longstanding discovery abuses." The bankruptcy court ultimately found that DiBassie had "no credibility" against the record adduced at trial.

court found that Emilynn functioned only as a nominal member of SCS and that Reeves and DiBassie were each 50% owners of the company. The court further found that DiBassie's transfers of funds from SCS to another entity she wholly owned constituted embezzlement.

Based on those findings, the bankruptcy court concluded that Reeves held a personal interest in a portion of the funds at issue and entered a nondischargeable judgment of $299,980.98 in his favor. The district court affirmed, concluding that Reeves had standing to pursue the § 523(a)(4) claim and that the LLC agreement was ambiguous as to ownership percentages in light of the circumstances surrounding SCS's formation. DiBassie then appealed to this court.

## II.

This court reviews "the decision of a district court sitting as an appellate court in a bankruptcy case by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." *Kreit v. Quinn (In re Cleveland Imaging & Surgical Hosp., L.L.C.)*, 26 F.4th 285, 292 (5th Cir. 2022) (quotation marks and citation omitted). We thus "review the bankruptcy court's legal conclusions *de novo* and its findings for clear error." *Id.* (citing *Edwards Fam. P'ship v. Johnson (In re Cmty. Home Fin. Servs., Inc.)*, 990 F.3d 422, 426 (5th Cir. 2021)). "Whether money is property of the debtor or the bankruptcy estate is a question of law[.]" *See Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 496 (5th Cir. 2006) (citing *State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 795 (5th Cir. 1997)). "Under Texas law," which the parties agree governs, "the interpretation of an unambiguous contract, including the determination whether the contract is ambiguous, is [also] a legal question[.]" *WBCMT 2007 C33 OFFICE 9720, L.L.C. v. NNN Realty Advisors, Inc.*, 844 F.3d 473, 477 (5th Cir. 2016).

## III.

## A.

The district court held, as the bankruptcy court did, that Reeves had standing to bring suit against DiBassie as a creditor of her estate. We agree.

Under the Bankruptcy Code, a person or entity that "has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor" is considered a "creditor." 11 U.S.C. § 101(10)(A), (15). A "claim," in turn, includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 101(5)(A).

DiBassie contends that Reeves cannot be a creditor of her estate because she embezzled funds from SCS—not from Reeves directly. But this contention rests on an unduly narrow conception of what constitutes a "claim" under the Code.

The Supreme Court has explained that Congress intended "to adopt the broadest available definition of 'claim'" in the Bankruptcy Code. *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). Consistent with that intent, this court has recognized that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'" *Southmark Corp. v. Schulte Rothe & Zabel (In re Southmark Corp.)*, 88 F.3d 311, 317 (5th Cir. 1996) (first quoting H.R.Rep. No. 95-595, at 309 (1977); and then quoting S.Rep. No. 95-989, at 22 (1978)).

Here, Reeves alleged—and the bankruptcy court eventually found— that Reeves and DiBassie were co-owners of SCS and that DiBassie embezzled funds in which Reeves held an ownership interest. *See Humphries v. Rogers (In re Humphries)*, 516 B.R. 856, 870–72 (Bankr. N.D. Miss. 2014)

(finding that a 50% owner of a closely-held corporation had embezzled funds from the company and holding that the other owner "had an interest in th[e] funds" that constituted a nondischargeable debt under § 523(a)(4)). Based on that ownership interest, Reeves possessed a "claim" against DiBassie, the debtor, within the meaning of § 101(5), and he thus qualified as a "creditor" of her estate under § 101(10). The bankruptcy court therefore correctly determined that Reeves had standing to pursue his claim.

**B.**

The district court also held that "the bankruptcy court did not err in concluding that the Agreement was ambiguous regarding Reeves's ownership share." We again agree.

"Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *see also Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011). A contract "is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (citation omitted). While "[p]arol evidence is not admissible for the purpose of creating an ambiguity" in the contract, it "is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement." *Nat'l Union*, 907 S.W.2d at 520.

Here, the parties submitted "five versions" of SCS's LLC agreement to the bankruptcy court, "both signed, unsigned, signed with a forged [electronically placed] signature and with or without attachments." The version that the bankruptcy court held controlled did "not contain any attachments which purport to control either a division of ownership or a

requirement of capital contributions." Unlike that version, other iterations of the LLC agreement included attachments that specified ownership percentages.[4] Because the controlling version did not have any relevant attachments, the bankruptcy court determined that the LLC agreement was ambiguous as to ownership percentage. Consulting parol evidence in the record, the bankruptcy court assigned Reeves a 50% ownership interest in SCS and Emilynn the other 50% ownership interest—though the court also found that DiBassie was the true owner of Emilynn's nominal 50% ownership share.

On appeal, DiBassie challenges only the court's holding that the LLC agreement was ambiguous, not its determination of which version of the agreement was binding. In DiBassie's view, the LLC agreement is *un*ambiguous because it references "Exhibit A attached hereto." The problem with this position is that it remains unclear what that reference means.

The parties do not dispute that there are "at least" two versions of Exhibit A, though neither of those versions reflects "an even distribution of shares." The version of the LLC agreement that the bankruptcy court accepted as controlling included no Exhibit A at all, reference notwithstanding. And Emilynn testified that Exhibit A had not been created at the time she signed the LLC agreement on March 4, 2021. She further stated that at the time, there had been no definite agreement about the

---

[4] As examples, one version of Exhibit A lists Emilynn and Reeves as members; a capital contribution from Emilynn of $500,000.00, and no contribution from Reeves; and 75 ownership units held by Emilynn and 25 held by Reeves. Another version lists Emilynn as a "Class A" member and Reeves as a "Class B" member, discloses no capital contributions from either member, and shows 100 ownership units held by Emilynn and 25 units held by Reeves.

No. 25-20170

members' respective ownership percentages prior to signing the LLC agreement.

Given this inconclusive evidence, the district court was correct to hold that the operative contract was ambiguous regarding the LLC members' ownership percentages.

## IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.