PRYOR, Circuit Judge,
dissenting:
“ ‘If is a big word,” Bracewell v. Kelley, No. 05-11951, op. at 1239 (11th Cir. June 30, 2006), but it is not the determinative word in this appeal for two reasons. First, Bracewell’s crop disaster payment is part of the debtor estate because “property of the estate” includes the contingent interest in disaster relief created by a reduced yield. See 11 U.S.C. § 541(a)(1). Second, Braeewell’s crop disaster payment is “proceeds ... from property of the estate” under the settled state law of property rights. 11 U.S.C. § 541(a)(6). I respectfully dissent.
I. BACKGROUND
I first explain the history of the Agricultural Assistance Act of 2003 and its interaction with Braeewell’s conversion under Chapter 7. The majority opinion appropriately and accurately explains what we know from the record: A drought caused Bracewell to suffer lower-than-expected yields. On May 29, 2002, because Brace-well was unable to pay for his farm-related debt, Bracewell filed a petition under Chapter 12 of the Bankruptcy Code. In a Chapter 12 proceeding, Bracewell’s crop disaster payment would have been included in the bankruptcy estate. Although not part of the record or evidence, other events illustrate the potential for abuse that the decision of the majority allows.
In the real world, in June 2002, a month after Bracewell filed his bankruptcy petition, several members of Congress announced to the press that they had begun work to provide drought assistance to farmers. See, e.g., Press Release, Congressman Tom Osborne, Osborne Refuses to Send Congress Home Without Securing Drought Assistance (Oct. 16-, 2002), available at http://www.house.gov/apps/list/ press/ne03_osborne/pr20021016crno.html. In July, Congressman John Thune sponsored the Emergency Farmer and Rancher Assistance Act of 2002 to grant relief for crop losses in 2001 and 2002. H.R. 5310, 107th Cong. (2002). Congress recessed at the end of that year before the legislation was enacted. Id.
*1248 On Friday, January 3, 2003, Bracewell converted his case under Chapter 7. Four days later, on Tuesday, January 7, 2003, Congress reconvened, and the drought assistance legislation was reintroduced in the House as part of an appropriations bill. 108 Bill Tracking H.J. Res. 2. On February 20, 2003, Congress enacted the Agricultural Assistance Act of 2003, which provided financial assistance to farmers who suffered crop losses in 2001 and 2002. Id. As the record shows, Bracewell then argued successfully that the money he later received from the government should not be included in the bankruptcy estate because he converted his case under Chapter 7 before Congress enacted the Agricultural Assistance Act of 2003.
I have no idea whether Bracewell knew about the proceedings in Congress that led to the enactment of the Agricultural Assistance Act of 2003. There is no evidence that he did, but we should not be oblivious to the possibility that some farmers already pay attention to these sorts of matters, and the majority opinion will cause farmers in bankruptcy to monitor them more closely. The workings of Congress are reported by the press, and farmers who suffer natural disasters already have incentives to investigate the likelihood of forthcoming relief. The majority opinion now gives them even more incentives. As we consider whether losses that ripen into post-petition gain are included in the debt- or estate, the background of these real-world consequences should not be forgotten. See Fed R. Evid. 201 advisory committee’s note (“The judicial process cannot construct every case from scratch, like Descartes creating a world based on the postulate Cogito ergo sum.”) (quoting Kenneth Davis, A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69, 73 (1964)).
In the context of this chronology, it becomes clear why the decision of the majority runs contrary to the policy goals of the Bankruptcy Code. Three fundamental policies of the Bankruptcy Code are (1) to discourage a race of creditors to the courthouse, Union Bank v. Wolas, 502 U.S. 151, 161, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991), (2) to preserve the security interests of creditors, United States v. Whiting Pools, Inc., 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983), and (3) “to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.” Butner, 440 U.S. at 55, 99 S.Ct. at 918 (internal quotations and citation omitted). Instead of discouraging a creditors’ race to the courthouse, the decision of the majority encourages debtors who are farmers to race to the courthouse to file or convert cases under Chapter 7 before Congress enacts farm assistance bills. Instead of preserving creditors’ security interests, the decision of the majority impairs security interests in crops damaged by natural disasters. Instead of a fresh start for debtors, the decision of the majority grants debtors who are farmers a windfall. A thorough inspection of the statutory language, precedents of the Supreme Court and our Court, and the legislative history of the Bankruptcy Code compels me to conclude that Congress did not intend to overturn the settled policy goals of bankruptcy in this circumstance.
II. DISCUSSION
My discussion is divided in two parts. I first look to the Bankruptcy Code, Supreme Court precedent, and legislative history to address the erroneous assumption of the majority that a loss incurred before the commencement of bankruptcy does not create a contingent interest that is “property of the estate.” 11 U.S.C. § 541(a)(1). I next review the state law of property rights to conclude that Bracewell’s crop disaster payment is “proceeds of the estate.” 11 U.S.C. § 541(a)(6). Under ei *1249 ther view, the decision of the district court to exclude Bracewell’s crop disaster payments from the debtor estate was wrong.

A. A Contingent Interest Created by a Loss Is “Property” of the Debtor Estate.

Section 541(a)(1) of the Bankruptcy Code provides that property of the debtor estate “is comprised of ... all legal or equitable interests of the debtor in property as of the commencement of the case.” 11 U.S.C. § 541(a)(1). All property interests of the debtor vest in the bankruptcy estate when the debtor files for bankruptcy. See 11 U.S.C. § 301; In re Alvarez, 224 F.3d 1273, 1277 (11th Cir.2000). “Property” has a broad meaning that encompasses “everything of value the bankrupt may possess in alienable or leviable form when he files his petition.” Segal v. Rochelle, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). Section 541 is “a definition of what is included in the estate, rather than ... a limitation” on the estate. Whiting Pools, 462 U.S. at 203, 103 S.Ct. at 2312.
Although the majority finds the statutory language of section 541(a)(1) “clear” and “so plain,” Bracewell, op. at 1237, I do not. I am unable to find any mention in section 541(a)(1) about whether an interest created by a pre-petition crop loss constitutes “property as of the commencement of the case.” 11 U.S.C. § 541(a)(1). If anything, the definition of “property” as “all legal or equitable interests ... as of the commencement of the case,” id. (emphasis added), suggests that Braeewell’s crop loss is a contingent interest in property included in the bankruptcy estate, but the text of section 541 does not resolve that issue definitively.
The majority’s alleged reliance on statutory text rests not on the plain language, but on two unsound assumptions. First, the majority assumes that a contingent interest in the form of a reduced yield is not a “legal or equitable interest” in property. Second, the majority assumes that whether a property interest exists “as of the commencement of the case” depends on the date of the enabling legislation for the crop disaster payment, instead of the date of the crop loss. The statutory language, legislative history, and controlling precedents from the Supreme Court establish that both assumptions are erroneous.
Two principles govern whether a loss incurred pre-petition is an interest included in the debtor estate. First, contrary to the majority’s first assumption, a loss may give rise to a property interest before enabling legislation grants payment for the loss. Williams v. Heard, 140 U.S. 529, 541, 11 S.Ct. 885, 888, 35 L.Ed. 550 (1891). Second, contrary to the majority’s second assumption, whether an interest accrued “as of the commencement of the case,” 11 U.S.C. § 541(a), is determined by reference to the date the loss is incurred, not the date the payment is received, see Williams, 140 U.S. at 541, 11 S.Ct. at 888. A post-petition gain is “sufficiently rooted in the pre-bankruptcy past” if a corresponding loss was incurred pre-petition. See Segal, 382 U.S. at 380, 86 S.Ct. at 515.
The Supreme Court has held that the debtor estate includes contingent interests that ripen into legal rights after commencement of the bankruptcy proceeding. In Segal, the Court held that a potential loss-carryback tax refund constituted “property” under the Bankruptcy Code. 382 U.S. at 381, 86 S.Ct. at 516. The Court stated that “property” under section 541 is “construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.” Id. at 379, 86 S.Ct. at 515. Although the debtor in Segal could not establish a right to a tax refund until the end of the tax year, “postponed *1250 enjoyment does not disqualify an interest as ‘property’ ” and “contingency in the abstract is no bar.” Id. at 380, 86 S.Ct. at 515. The Court explained that “taxes had been paid on net income within the past three years, and the year of bankruptcy at that point exhibited a net operating loss.” Id. Because the prospective refund was “sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts’ ability to make an unencumbered fresh start,” the tax refund, once received, was included in the debtor estate. Id.
To avoid the binding authority of Segal, the majority argues that Segal was superseded by the enactment of the Bankruptcy Code. The majority states that it “will not attribute to the Supreme Court an intent to construe legislative language that it had not seen and which would not even exist for another dozen years.” Bracewell, op. at 1242, 2006 WL 1814367. As support, the majority cites to Drewes v. Vote (In re Vote), 261 B.R. 439, 443-44 (B.A.P. 8th Cir.2001), and Burgess v. Sikes (In re Burgess), 438 F.3d 493, 498 (5th Cir.2006) (en banc), where the Bankruptcy Appellate Panel for the Eighth Circuit and the Fifth Circuit respectively distinguished Segal to conclude that crop disaster payments are not part of the debtor estate.
The court in Vote limited the test in Segal to tax refunds because of the legislative history of the Bankruptcy Code. The court explained that Congress may have intended to limit the holding of Segal to tax refunds when it enacted the new Bankruptcy Code. Vote, 261 B.R. at 443-44. Because the court found the precedential value of Segal to be questionable and the crop disaster legislation was enacted post-petition, the court concluded that such payments are not part of the debtor estate. Id.
The Fifth Circuit also distinguished Se-gal because “although Congress has specifically approved of Segal’s result, Segal’s ‘sufficiently rooted’ test did not survive the enactment of the Bankruptcy Code.” Burgess, 438 F.3d at 498. The court in Burgess explained that the statutory language considered in Segal is different from the language of section 541. “Thus, under current law, a debtor’s interest in property may be contingent ... until after bankruptcy, but the debtor must have had a prepetition legal interest nonetheless.” Id. at 499. The Fifth Circuit concluded that the debtor had no legal interest in the crop disaster payment “because the legislation authorizing the payment had not yet been enacted.” Id.
The statutory text, our precedent, and legislative history establish that “[tjhere is little or no support” for the view of the majority and the Fifth Circuit that the current Bankruptcy Code superseded the holding in Segal. Id. at 512 (Jones, C.J., dissenting). First, section 541 did not supersede Segal because Congress did not materially alter the text of the statute. The previous version of the Code provided, “The trustee of the estate of a bankrupt ... shall ... be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition ... to all of the following kinds of property wherever located.” 11 U.S.C. § 110(a) (1964) (emphases added). The current version of the Code provides that property of the estate “is comprised of all the following property, wherever located and by whomever held: ... all legal or equitable interests of the debtor ... as of the commencement of the case.” 11 U.S.C. § 541(a)(1) (emphases added). “[Ajbsent express indications to the contrary, the reenactment of statutes in substantially the same form or their wholesale adoption into other statutory schemes is presumed to perpetuate and incorporate the judicial baggage that has accumulated in relation to those provisions.” Rivers v. Rosenthal & Co., 634 F.2d 774 (5th Cir.1980), vacated on other *1251 grounds, 456 U.S. 968, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982). The majority does not respond to this argument. The change in statutory language is legally insignificant because the broad definition of “property” and the temporal limitation considered in Segal continues in the current version of section 541(a)(1).
Second, our Court has applied Segal twice to guide our interpretation of the current Bankruptcy Code. See, e.g., Witko v. Menotte (In re Witko), 374 F.3d 1040, 1043 (11th Cir.2004), Alvarez, 224 F.3d at 1278. We stated, in Alvarez, that although “Segal was decided under the 1898 Act, nothing in the changed language suggests a change in the relevant Segal holding.” 224 F.3d at 1278 n. 13. In Witko, the decision upon which the majority principally relies, we discussed Segal at length and relied on Segal for the proposition that a trustee may “seek the interests existing, though still undetermined in quantity, at the time the debtor filed his petition.” Witko, 374 F.3d at 1043. Other circuits likewise have applied the rationale in Segal. See, e.g., In re Yonikus, 996 F.2d 866, 869 & n. 3 (7th Cir.1993); In re Schneider, 864 F.2d 683, 685 (10th Cir.1988); In re Ryerson, 739 F.2d 1423, 1426 (9th Cir.1984). These decisions explain that the precedential value of Segal was not diminished by the enactment of the current Bankruptcy Code.
Third, the majority ignores the legislative history of the current code, which states that Congress endorsed the conclusion in Segal. “The result of Segal v. Rochelle, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), is followed ....” See S.Rep. No. 989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R.Rep. No. 595, 95th Cong., 1st Sess. 367, reprinted in 1978 U.S.C.C.A.N. 5963, 6323; see Alvarez, 224 F.3d at 1279 n. 13 (stating that “the legislative history expressly indicates that the current Code follows Segal’s result”). Despite a professed concern about erroneously ascribing an intent to the Supreme Court, the majority readily ascribes a dubious intent to Congress based on, at best, ambiguous language without resorting to legislative history. Cf. CBS v. PrimeTime 24 J.V., 245 F.3d 1217, 1224 (11th Cir.2001). A consistent reading of both the earlier and later statutory language, the guidance derived from decisions of our Circuit and sister circuits, and the legislative history leads me to conclude that the current Bankruptcy Code did not supersede the holding in Segal.
Two venerable decisions of the Supreme Court buttress the holding in Segal. See Williams, 140 U.S. 529, 11 S.Ct. 885; Milnor v. Metz, 41 U.S. (16 Pet.) 221, 10 L.Ed. 943 (1842). These precedents establish that property rights are “created by reason of losses having been suffered,” Williams, 140 U.S. at 541, 11 S.Ct. at 888, not by later legislation that provides compensation for those losses. Each of these decisions supports the Trustee’s argument that Bracewell’s crop loss was a contingent property interest when he filed for bankruptcy.
The later decision, Williams, involved a payment created by Congress for a loss suffered during the Civil War. Id. at 539, 11 S.Ct. at 887. The debtor in Williams had insured ships damaged in the Civil War. Id. at 539-40, 11 S.Ct. at 887. He filed for bankruptcy in 1875 and obtained a discharge in 1877. Id. at 539, 11 S.Ct. at 887. In 1882, five years after the discharge from bankruptcy, Congress passed legislation to distribute money awarded to the United States from a treaty executed with Great Britain. Id. The debtor was awarded compensation based on this legislation. Id. The Supreme Court included the distribution from the treaty in the bankruptcy estate because “[t]here [was] *1252 .,, at all times a possibility that the government would see that [those who suffered harm] were paid.” Id. at 541, 11 S.Ct. at 888 (emphasis added). The Court explained that “there was at all times a moral obligation on the part of the government to do justice to those who had suffered in property---- [T]he act of Congress did not create the rights. They had existed at all times since the losses occurred.” Id.
The earlier decision, Milnor, reached the same result for a debtor who received a payment based on post-petition legislation. 41 U.S. at 227. In Milnor, the debtor was a gauger in the port of Philadelphia. 41 U.S. at 225. In 1886, an act of Congress reduced duties upon wine that required the debtor to perform extraordinary services “at the instance of the government” without compensation. Id. at 226. In 1889, the debtor filed for bankruptcy, and in 1840, Congress enacted legislation that compensated the debtor for his services. Id. at 224. Although Congress enacted legislation that granted compensation post-petition and “no claim existed against the United States, which could be judicially recognised as ‘property’ ” before the debtor filed for bankruptcy, the Court included the compensation in the debtor estate. Id. at 227.
The majority opinion and the Fifth Circuit distinguished Milnor and Williams on the grounds that both cases “predate the enactment of the current Bankruptcy Code by approximately 100 years” and “stand for the proposition that a prepetition loss is property of the estate if it gives rise to a prepetition legal claim or interest.” Burgess, 438 F.3d at 503; see Bracewell, op. at 1244. The Burgess court explained that the debtor in Milnor had a pre-petition legal interest because “even though [debt- or] Milnor could not sue the government for the amount of the debt, the debt still existed.” Burgess, 438 F.3d at 504. The court also distinguished Williams because “the debtors had a legal claim against someone,” while the bankrupt farmer in Burgess “had no claim against anyone.” Id. at 505. I find both reasons unpersuasive.
That Williams and Milnor were decided before the enactment of the Bankruptcy Code does not blunt their proposition that “even a prepetition loss of the debtor’s property may itself constitute property when subsequent events afford a recovery for the loss.” Id. at 512 (Jones, C.J., dissenting). It is fair to conclude that Congress was aware of the law of property rights as recognized in bankruptcy when it enacted the current version of the Bankruptcy Code because “[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law.” Cannon v. Univ. of Chi., 441 U.S. 677, 696-97, 99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979). Although the Courts in Williams and Milnor did not consider the current version of section 541(a), they nonetheless confronted what is a “legal or equitable interest” included in the debtor estate. Compare Williams, 140 U.S. at 538, 11 S.Ct. at 887 (“[N]o individual claimant had, as a matter of strict legal or equitable right, any lien upon the fund awarded, nor was Congress under any legal or equitable obligation to pay any claim out of the proceeds of that fund.” (emphases added)), and Milnor, 41 U.S. at 226 (analogizing the debtor’s right to cases where debtors had no “equitable or legal set-off’), with 11 U.S.C. § 541(a) (“Such estate is comprised of ... all legal or equitable interests .... ” (emphasis added)). Both decisions are applicable to Bracewell’s crop disaster payment because they address the limits of a contingent property interest in the bankruptcy context.
*1253 The factual distinctions between Williams and Milnor, on the one hand, and BracewelPs crop disaster payment, on the other hand, are immaterial. Although in Milnor “[t]he services performed by Milnor were at the instance of the government” and “the government was equally bound to do its debtor justice,” Milnor, 41 U.S. at 227, Milnor had no enforceable right against the government when he filed for bankruptcy. Although the Fifth Circuit found significant in Williams that “the debtors had a legal claim against someone,” Burgess, 438 F.3d at 505, the fact remains that the debtor had no enforceable rights against the government. See Williams, 140 U.S. at 538, 11 S.Ct. at 887 (“[N]o individual claimant had, as a matter of strict legal or equitable right, any lien upon the fund awarded.”). Although the possibility was remote that Britain would compensate American casualties of war and Congress would enact legislation that granted relief five years after the debtors were discharged from bankruptcy, the Supreme Court concluded this eventuality was sufficient to create a contingent interest to be included in the debtor estate. See id. (“Congress [was] under [no] legal or equitable obligation to pay any claim out of the proceeds of that fund.”). The contingent interests held by the debtors in Williams and Milnor were premised on their pre-petition losses and the possibility, .however remote, of compensation.
As in Williams, “[tjhere was at least a possibility” that Congress would enact legislation to grant Bracewell relief, id., because “[government payments to farmers have long represented a major source of income for American farmers and ranchers,” John K. Pearson, Lien on Me: Revised Article 9 and Government Entitlement Program Payments, 22-8 Am. Bankr.Ins. J. 24, 24 (2003). Braeewell’s crop loss established “a possibility coupled with an interest” sufficient to be included in the debtor estate. Williams, 140 U.S. at 538, 11 S.Ct. at 887. The crop loss that Bracewell suffered pre-petition established a contingent property interest that ripened into a gain post-petition due to legislation enacted by Congress. “But the act of Congress did not create the rights. They had existed at all times since the losses occurred.” Id. at 541, 11 S.Ct. at 888.
Under both Williams and Milnor, the inclusion of Bracewell’s crop disaster payment in the debtor estate neither renders the phrase “as of the commencement of the case” meaningless nor runs “contrary to the plain meaning of the clear statutory language.” Bracewell, op. at 1240. The concern of the majority that “any postpetition legislation or contract could retroactively create property of the estate,” id., op. at 1238 (citing Burgess, 438 F.3d at 503), is misplaced, because contingent interests, including losses, incurred after the commencement of the proceedings are not included in the debtor estate. Only contingent property interests that exist “as of the commencement of the case” can benefit the estate when those interests later ripen into post-petition gain.
Until today, our decisions have not deviated from these principles. We have stated, for example, that a legal malpractice complaint filed post-petition is “sufficiently rooted in the pre-bankruptcy past” to be included in the debtor estate. Alvarez, 224 F.3d at 1275. In Alvarez, we concluded that a debtor’s malpractice suit accrued pre-petition under Florida law because the debtor, Alvarez, suffered harm pre-petition. Id. at 1277-78. Although Alvarez filed the malpractice complaint after the bankruptcy petition, Alvarez had suffered “sufficient injury to indicate that Alvarez had a cognizable interest” pre-petition. Id. at 1277. Because Alvarez “established an attorney-client relationship ... prior to *1254 his filing for bankruptcy, and this cause of action arises directly out of Alvarez’s interactions with the firm prior to filing,” we applied the rationale of Segal to conclude that the malpractice complaint was included in the bankruptcy estate. Id. at 1278-79.
The majority’s reliance on Witko, rather than Alvarez, is misplaced. In contrast with Alvarez, in Witko we excluded a complaint filed post-petition from the debtor estate because the debtor suffered harm post-petition. See Witko, 374 F.3d at 1043. Witko filed for bankruptcy in 1999. Id. at 1042. In 2000, Witko was denied alimony in a marital dissolution and he filed a malpractice suit against his divorce counsel. Id. We stated that “interests existing, though still undetermined in quantity, at the time the debtor filed his petition” are included in the debtor estate. Id. at 1043. We looked to Florida law and concluded that Witko’s malpractice suit had not accrued before he filed his petition for bankruptcy because “[w]hen Witko filed his bankruptcy petition he had not yet suffered any harm.” Id. at 1043-44. Witko is inapposite to this appeal because, unlike Bracewell, the debtor in Witko did not suffer a loss until after the commencement of the bankruptcy case.
Consistent with our precedent in Alvarez, the crop disaster payment Bracewell received is “property as of the commencement of the case.” Bracewell planted his crops pre-petition, Bracewell lost his crops pre-petition, and the Act compensated Bracewell for the crop loss that occurred pre-petition. Bracewell’s crop loss “point[ed] toward realization of a refund ... at the time the[ ] bankruptcy petition[][was] filed,” Segal, 382 U.S. at 380, 86 S.Ct. at 515, because “Congress frequently and regularly enacts a variety of farm subsidy programs,” Lemos v. Rakozy (In re Lemos), 243 B.R. 96, 99 (Bankr.D.Idaho 1999). The crop disaster payment is “sufficiently rooted in the pre-bankruptcy past.” Segal, 382 U.S. at 380, 86 S.Ct. at 515.
The majority finds solace in decisions of our sister circuits that have excluded crop disaster payments from the debtor estate when those payments were received post-petition. See Burgess, 438 F.3d at 497; Vote, 261 B.R. at 442. These courts and the majority have focused on the date that the legislation is enacted, instead of the date of the loss, to exclude crop disaster payments from the debtor estate. See Bracewell, op. at 1238 -1239; Burgess, 438 F.3d at 499 (“[H]e did not have a prepetition claim to, or interest in, the disaster-relief payment because the legislation authorizing the payment had not yet been enacted.”); Vote, 276 F.3d at 1026 (“Before Congress passed the Appropriations Act, [the debtor] had no interest of any kind.”). As the Eighth Circuit reasoned, because “there was no assurance that Congress would authorize such payments or that the Debtor would qualify for them if they were authorized,” the crop disaster payments are not included in the debtor estate. Vote, 261 B.R. at 444 (emphasis added).
In the light of Supreme Court precedent, I find the reasoning of both the majority and our sister circuits, in Burgess and Vote, unpersuasive. That Congress enacted the legislation post-petition is not outcome determinative because a loss, by itself, may create a property interest without congressional legislation. Williams, 140 U.S. at 541, 11 S.Ct. at 888. When the loss accrues “as of the commencement of the case,” it is included in the debtor estate.
The reliance of the majority on another decision of a sister circuit, In re Schmitz, 270 F.3d 1254 (9th Cir.2001), is misplaced. The Ninth Circuit in Schmitz held that fishing rights assessed post-petition based *1255 on the debtor’s fishing history “were not property of the bankruptcy estate because the regulations creating them were not adopted until after the bankruptcy petition was filed.” Id. at 1256. Schmitz is inapposite to this appeal because, unlike Brace-well, the debtor in Schmitz did not suffer a loss before he filed for bankruptcy that was compensated by post-petition legislation.
Although, as the majority states, “ ‘If is a big word,” Bracewell, op. at 1239, it is not the determinative word because “property” includes contingent interests. Segal, 382 U.S. at 379, 86 S.Ct. at 515. The contingent nature of Bracewell’s interest is similar to a loss carryback that may result in a tax refund if the taxpayer has the proper tax characteristics at the end of the year, Segal, 382 U.S. at 381, 86 S.Ct. at 516; a casualty of war that may result in payment from the execution of a treaty and legislation after the discharge of bankruptcy, Williams, 140 U.S. at 541, 11 S.Ct. at 888; the provision of overtime services to the government that may lead to payment based on post-petition legislation, Milnor, 41 U.S. at 227; or pre-petition harm caused by legal malpractice that may result in damages pending judicial process, Alvarez, 224 F.3d at 1277-78. See also In re Dalton, 146 B.R. 460, 463 (Bankr.D.Ariz.1992) (holding that a lottery ticket purchased pre-petition that won post-petition was included in the debtor estate). Bracewell, like the debtors in Segal, Williams, Milnor, and Alvarez, was not yet entitled to his later payment when he converted his case under Chapter 7, but the crop disaster payment he received post-petition related to his pre-bankruptcy past.
The crop loss that Bracewell suffered created a contingent right to receive crop disaster relief of an unascertained value. After the crop loss, the only questions that remained were whether Congress would grant relief and whether Bracewell would fall within the purview of any legislation that Congress enacted. See http://disas-ter.fsa.usda.gov/nap.htm (listing eligibility requirements for crop disaster relief). The crop disaster legislation fixed the value that Bracewell received for his lost crops, but the earlier absence of legislation did not make Bracewell’s crop loss, or contingent interest, a nullity. Nothing in the language of section 541, Supreme Court precedent, or Eleventh Circuit precedent suggests that the debtor estate only includes property with an absolute value, and I find no principled method to create a sliding scale of contingent property interests that includes some interests in the debtor estate while excluding others.
The inclusion of crop disaster payments in the debtor estate comports with the policy of the Bankruptcy Code to prevent debtor abuse. Whether crop disaster payments are included in the debtor estate should not depend on the date of the legislative act because a debtor could exclude crop disaster payments if he chose to file his bankruptcy petition before Congress enacts legislation to grant relief. Bankruptcy policy dictates whether an interest is included in the debtor estate, Segal, 382 U.S. at 379, 86 S.Ct. at 515, and a debtor should not be allowed selectively to exclude property from the debtor estate by choosing the most advantageous date to file for bankruptcy. “The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession.” Whiting Pools, 462 U.S. at 207, 103 S.Ct. at 2314-15. Other provisions of the Bankruptcy Code protect creditors’ interests and prevent debtor abuse by limiting the debtor’s ability to select property that will be included in the debtor estate. See 11 U.S.C. § 544(b)(1) (strong arm provisions); id. § 547 (voidable preferences); id. § 727 *1256 (fraudulent transfers); cf. Yonikus, 996 F.2d at 871 (“Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate.”). The exclusion of disaster payments from the bankrupt estate creates a windfall for the debtor at the expense of creditors contrary to the design of the Code.
I conclude that Bracewell’s crop loss disaster payment is “property of the estate.” 11 U.S.C. § 541(a)(1). Because Bracewell planted the crops pre-petition and lost the crops pre-petition, and legislation compensated him for that pre-petition loss, Bracewell’s crop disaster payment was “rooted in the prebankruptcy past.” Segal, 382 U.S. at 380, 86 S.Ct. at 515. I turn next to the majority’s erroneous conclusion that Bracewell’s crop disaster payment was not “proceeds” of the debtor estate.

B. Bracewell’s Crop Disaster Payment Is “Proceeds” of the Debtor Estate.

The majority’s devotion to statutory text is nowhere to be found when the majority concludes that the crop disaster payment is not included in the debtor estate as “proceeds” despite the plain language of the Georgia version of the Uniform Commercial Code. The majority states that “[i]f the property of the estate does not include a potential future payment that the debtor is not legally entitled to receive at the time of filing, nothing in § 541(a)(6) pushes the later-acquired legal or equitable interest back into the estate.” Brace-well, op. at 1245. The majority concludes that “the property of his estate did not include an interest that could generate proceeds.” Id. at 1245. The majority overlooks the fact that, under state law, an expected yield is a leviable property interest and a crop disaster payment is “proceeds” of the expected yield.
Section 541(a)(6) of the Bankruptcy Code provides that the debtor estate includes “[pjroceeds, product, offspring, rents, or profits of or from property of the estate ....” 11 U.S.C. § 541(a)(6). Congress has stated that “proceeds” under the Bankruptcy Code is broader than under the Uniform Commercial Code. S.Rep. No. 989, 95th Cong., 2d Sess., at 83 (1978), reprinted in 1978 U.S.C.C.A.N. at 5869; H.R.Rep. No. 595, 95th Cong., 1st Sess., at 368 (1977), reprinted in 1978 U.S.C.C.A.N. at 6324. “[T]he scope of ... Section 541(a)(6) is quite broad, [and] encompass[es] any conversion in the form of property of the estate, and anything of value generated by property of the estate.” In re Hanley, 305 B.R. 84, 86-87 (Bankr.M.D.Fla.2003) (citations omitted). Under section 541(a)(6), “proceeds” must come from the “property of the estate” to be included in the debtor estate.
Although “whether a debtor’s interest constitutes propei'ty of the estate is a federal question,” Hall Motors, Inc. v. Lewis (In re Lewis), 137 F.3d 1280, 1283 (11th Cir.1998), the majority agrees that state law governs the creation of property interests. Bracewell, op. at 1246; see Butner, 440 U.S. at 54, 99 S.Ct. at 917-18. “Uniform treatment of property interests by both state and federal courts within a State serves ... to prevent a party from receiving ‘a windfall merely by reason of the happenstance of bankruptcy.’ ” Butner, 440 U.S. at 55, 99 S.Ct. at 918 (quoting Lewis v. Mfrs. Nat’l Bank, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)). “Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.” Witko, 374 F.3d at 1043.
*1257 It is particularly appropriate to look to state law to interpret what is “proceeds” because the legislative history of section 541(a)(6) explicitly references the Uniform Commercial Code. “Proceeds here is not used in a confining sense, as defined in the Uniform Commercial Code, but is intended to be a broad term to encompass all proceeds of property of the estate.” S.Rep. No. 989, 95th Cong., 2d Sess., at 83 (1978), reprinted in 1978 U.S.C.C.A.N. at 5869; H.R.Rep. No. 595, 95th Cong., 1st Sess., at 368 (1977), reprinted in 1978 U.S.C.C.A.N. at 6324. “The definition of proceeds under the UCC is much narrower than the definition of proceeds under the Bankruptcy Code.” FarmPro Servs., Inc. v. Brown (In re FarmPro Servs., Inc.), 276 B.R. 620, 626 (Bankr.D.N.D.2002). If the definition of “proceeds” in the Uniform Commercial Code is “confining,” id., then “proceeds” as defined in Bankruptcy Code undoubtedly must be broader. Because the definition of “proceeds” in the Georgia UCC encompasses a crop disaster payment and the definition of “proceeds” in the Bankruptcy Code is broader than the UCC, crop disaster payments are a fortiori included in the debtor estate as “proceeds.”
Georgia law defines “proceeds” as “(A) Whatever is acquired upon ... disposition of the collateral; (B) Whatever is collected on, or distributed on account of, collateral; (C) Rights arising out of collateral; (D) To the extent of the value of the collateral, claims arising out of the loss[ ] ... or damage to the collateral.” O.C.G.A. § 11-9-102(a)(63). “ ‘Collateral’ means the property subject to a security interest or agricultural lien.” Id. § 11-9-102(a)(13). Georgia broadly interprets “collateral” under the UCC to include “inchoate rights, in any and all crops to be planted, grown or produced on [the] property in the future.” Sw. Ga. Prod. Credit Ass’n v. James, 180 Ga.App. 795, 350 S.E.2d 786, 788 (1986). Under Georgia law, a crop disaster payment is the result of a “loss[ ] ... or damage to” crops “to be planted, grown, or produced.” O.C.G.A. § 11—9—102(a)(63)(D); Sw. Ga. Prod. Credit Ass’n, 350 S.E.2d at 788.
Bracewell’s crop disaster payment is “proceeds” under the Georgia Uniform Commercial Code. Bracewell received the payment for “the loss of ... or damage to” his crops. O.C.G.A. § 11-9-102(a)(63)(D). Bracewell’s payment is “from property of the estate,” see 11 U.S.C. § 541(a)(6), because the expected crop yield was a levia-ble and cognizable property interest under Georgia law. See Sw. Ga. Prod. Credit Ass’n, 350 S.E.2d at 787 (holding that a creditor’s security interest in “all crops now growing or may hereafter be planted, grown or produced within seven years from the date hereof and all proceeds therefrom” granted the creditor a right to receive money from a reduced yield even though “no profit was made” (internal quotation marks omitted)). Thanks in part to the creditors seeking relief in his bankruptcy, Bracewell planted crops and, despite a lower-than-expected yield, obtained a payment for his reduced yield. The crop disaster payment “ar[ose] out of the loss of ... or damage to” Bracewell’s expected crops. O.C.G.A. § 11-9-102(a)(63)(D). If Bracewell had never planted or expected crops, he never would have received the crop disaster payment.
The majority reasons that Bracewell’s payment is not proceeds “[b]ecause th[e crop disaster payment] was not given in exchange for property of the estate,” Bracewell, op. at 1245, but Georgia law— and consequently the Bankruptcy Code— does not limit “proceeds” to items “given in exchange for property of the estate,” id.-, Georgia law requires only that “proceeds” “aris[e] out of the loss of ... or damage to” the crops, O.C.G.A. § 11—9—102(a)(63)(D). Proceeds “is meant to include anything that is received in conse *1258 quence of the disposition of collateral.” In re Schmaling, 783 F.2d 680, 683 (7th Cir.1986) (quoting In re Connelly, 41 B.R. 217, 220 (Bankr.D.Minn.1984)). The reliance by the majority on the congressional intent of the Agricultural Assistance Act of 2003 to characterize the payment as “assistance” to farmers, Bracewell, op. at 1245, is likewise unavailing because nothing in Georgia law or the Bankruptcy Code excludes a payment meant as assistance.
The majority expressly declines to discuss decisions that have enforced security interests in crop disaster payments. Several courts have recognized the right of a creditor to acquire a security interest in crop disaster payments and collect the payment through bankruptcy. See Schneider, 864 F.2d at 685; Pombo v. Ulrich (In re Munger), 495 F.2d 511, 513 (9th Cir.1974); In re Boyett, 250 B.R. 817, 822 (Bankr.S.D.Ga.2000); FarmPro Servs., Inc., 276 B.R. at 626; Lemos, 243 B.R. at 101; In re Kruse, 35 B.R. 958, 965 (Bankr.D.Kan.1983); cf. Schmaling, 783 F.2d at 683 (concluding that the security agreement in that case did not cover proceeds, but stating that government entitlements are proceeds where crops were actually planted). Courts have also concluded that creditors have a right to proceeds from government programs when the debtor plants crops that never materialize, although the debtor did not participate in the government program when the creditor established the security interest. See Kruse, 35 B.R. at 965.
The conclusion of the majority leads to an absurd result. The exclusion of the payment as proceeds of the .debtor estate violates the fundamental tenet of bankruptcy law to preserve the security interests of creditors within bankruptcy. “The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession.” Whiting Pools, 462 U.S. at 207, 103 S.Ct. at 2314-15. “[T]he protections afforded secured creditors under the Code generally adhere first to the principle that the secured creditor is entitled to priority payment out of its collateral, and second to the principle that the secured creditor is entitled to receive the equivalent value of its collateral.” Colliers on Bankruptcy ¶ 506.02 (15th ed. rev.2006).
Under the majority’s view, a debtor can effectively void a valid security interest held by a creditor by filing a bankruptcy petition. Outside of bankruptcy, under the definition of “proceeds” in Georgia law, a creditor with a security interest in the proceeds of a debtor’s crop would be able to recover any crop disaster payment the debtor receives. See O.C.G.A. § 11-9-102(a)(63); cf. Sw. Ga. Prod. Credit Ass’n, 350 S.E.2d at 787. Within bankruptcy, the same creditor would be unable to benefit from the crop disaster payment because the payment is not included in the debtor estate. The conclusion of the majority creates “a windfall merely by reason of the happenstance of bankruptcy.” Lewis, 364 U.S. at 609, 81 S.Ct. at 350. According to the majority, because Bracewell decided to convert under Chapter 7 before the enactment of the legislation granting him relief, Bracewell both discharged his pre-bank-ruptcy debts to his creditors who provided capital for Braeewell’s pre-bankruptcy crops and voided any security interests in the proceeds of the crops that the creditors otherwise might have enforced. Although the majority cautions that we should not seek to improve a statute under the guise of interpreting it, see Bracewell, op. at 1240 -1241, nothing in the statutory text requires us to interpret “proceeds” in a way that is “so bizarre that Congress could not have intended it.” Demarest v. *1259 Manspeaker, 498 U.S. 184, 190-91, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991).
To reach the conclusion that crop disaster payments axe not proceeds of the debt- or estate, the majority must ignore the text of the Georgia Code, the legislative history of the Bankruptcy Code, and the fundamental policy goals of secured transactions and bankruptcy. Under the guise of interpreting section 541(a)(6), the majority voids valid rights granted to creditors by Georgia law. See Bracewell, op. at 1240-1241, 2006 WL 1814367. I must disagree with that conclusion.
Because I would reverse the decision of the district court, I respectfully dissent.