Honorable Jim D. Pappas, United States Bankruptcy Judge
Introduction
On April 14, 2017, Roger and Vickie L. Bolton ("Debtors") amended their schedule B in the bankruptcy case to include their products liability claim against a manufacturer arising out of Mr. Bolton's hip replacement. Dkt. No. 120 at 3. Debtors also amended their schedule C to claim 100% of the value of the claim exempt under Idaho Code § 11-604(1)(c). Dkt. No. 120 at 5. Chapter 7[1] trustee, Gary L. Rainsdon ("Trustee"), filed an objection to Debtor's amended exemption claim. Dkt. No. 122. Debtors responded to the objection, arguing that Mr. Bolton needs all of the funds that may derive from his products liability claim for support. Dkt. No. 133.
On September 18, 2017, the parties filed a stipulation, agreeing to limit the issue for *47 the Court to determine at this time to whether Debtors' claim against the manufacturer of the alleged defective hip device is property of the estate. Dkt. No. 145.[2] The parties filed pre-hearing briefs, Dkt. Nos. 148, 150, 151, 153, along with declarations and affidavits with attachments. Dkt. Nos. 149, 152.
On October 18, 2017, the Court conducted a hearing at which the parties argued their positions and answered questions from the Court. The Court continued the hearing to allow the parties to supplement the record. The parties submitted additional documentary evidence and filed supplemental briefs. Dkt. Nos. 156-58.
On November 15, 2017, the Court conducted a second hearing concerning the objection. Thereafter, the Court took the issues under advisement. Having considered the parties' evidence, briefs, and arguments, as well as the applicable law, this Memorandum sets forth the Court's findings, conclusions, and reasons for its disposition of the objection. Rules 7052; 9014.
Facts
On October 16, 2007, Mr. Bolton underwent right hip replacement surgery performed by Dr. Mark B. Wright in Twin Falls, Idaho. Robinson Aff. Ex. A, Dkt. No. 152-1 at 17. One month later, Mr. Bolton had a follow-up visit with Dr. Wright. Dkt. No. 152-1 at 24. Dr. Wright's notes from that visit indicate:
The right hip has no pain with IR/ER. He has some discomfort in the groin area with a straight leg test, slightly.
X-Rays were reviewed and show the prosthesis is positioned well. There is no change in position.
Impression: Right THA, doing well.
Id.
Mr. Bolton also saw Dr. Wright a number of times in early 2008. Dr. Wright's notes from a January 2008 visit observed that Mr. Bolton's hip had an excellent range of motion, that X-rays showed his hip was well-positioned and well-fit, and that Mr. Bolton believed his hip was doing well. Dkt. No. 152-1 at 25-27. Dr. Wright's notes from a March 2008 visit reflect that Mr. Bolton was "doing quite well with his right hip. The pain has gotten significantly better and overall he feels good. He has some catching and a popping sensation in the hip that is not painful, but it is kind of off when it occurs." Dkt. No. 152-1 at 26. And finally, Dr. Wright's notes from an April 2008 visit indicate that he and Mr. Bolton felt the hip was doing well, and that Mr. Bolton was "quite happy with his progress to this point." Dkt. No. 152-1 at 27. Dr. Wright instructed Mr. Bolton to return in six months, but sooner if he was experiencing problems with his right hip. Dkt. No. 152-1 at 27. There is no evidence that such a visit occurred.
Over a year later, on July 2, 2009, Debtors filed a chapter 7 petition. Dkt. No. 1. Trustee served as trustee. Debtors received a discharge, Dkt. No. 27, and the "no asset" bankruptcy case was closed on December 19, 2011. Dkt. No. 112.
On November 11, 2009, over a year and a half after Mr. Bolton's last visit, Mr. Bolton visited Dr. Wright. Dkt. No. 152-1 at 30. Concerning Mr. Bolton's hip, Dr. Wright's notes recite that "he states that he has groin [sic] occasionally when he *48 walks for a prolonged time and with prolonged sitting. He states that this has been getting worse over the past 6 months." Dkt. No. 152-1 at 30. The notes go on:
[Mr. Bolton] understands that I have concerns [that] the cup may be loose. The x-rays show a small radiolucency about the cup and with the history of this implant, which I discussed with him may represent loosening. He feels like he can put up with it. For now. At some point in the future he may benefit from replacement of the acetabular component. I would like to try and get more time out of this component because Zimmer is trying to engineer a good alternative, which we can salvage and replace the acetabular side.
Dkt. No. 152-1 at 32. The imaging report from that visit provides that "multiple views show that there may be lucency around the acetabulum. No evidence of migration." Dkt. No. 152-1 at 33.
Mr. Bolton apparently "put up with" his hip problems for over a year. His medical records indicate he did not see Dr. Wright again until November 24, 2010. Dr. Wright's notes from that visit reflect that Mr. Bolton had experienced pain since his hip replacement in October 2007 that had gotten progressively more concerning. Dkt. No. 152-1 at 34. At that time, Dr. Wright determined that the cup, and possibly the stem, of the hip replacement device, would need to be replaced.
On January 18, 2011, Mr. Bolton had a right total hip "revision" of his replacement. Dkt. No. 152-1 at 39. The operative report indicates that Mr. Bolton "had persistent right groin pain following a total hip replacement with metal on metal that was done approximately 3 years ago." Dkt. No. 152-1 at 39. The notes from a follow-up visit to Dr. Wright on February 16, 2011, provide that "[Mr. Bolton] states that at this point he is doing better than he did after the first operation." Dkt. No. 149-6.
On March 26, 2012, Debtors retained an attorney for matters related to Mr. Bolton's hip revision. Dkt. No. 120 at 4. On January 2, 2013, Debtors filed a products liability action against the manufacturer of the components used in Mr. Bolton's hip replacement surgery in the United States District Court for the District of New Jersey. Dkt. No. 157-1 at 3.[3] In their complaint, Debtors included causes of action for strict liability, negligence, breach of implied warranty of merchantability, and breach of express warranty. Dkt. No. 157-1 at 4-6.
Over four years later, in a letter dated March 29, 2017, the law firm representing Debtors in the products liability litigation informed Trustee that the manufacturer had offered Debtors approximately $235,000 to settle their claims. Rainsdon Declaration Ex. B, Dkt. No. 157-2. On March 30, 2017, Trustee filed a motion to reopen Debtors' bankruptcy case to administer Debtors' products liability claim and any recovery, which he believed were property of the bankruptcy estate. Dkt. No. 114. The Court entered an order reopening Debtors' bankruptcy case on March 31. Dkt. No. 115.
On April 14, 2017, Debtors amended their schedule B in the bankruptcy case to include the products liability claim against the manufacturer arising from the hip replacement "and subsequent difficulties that developed in 2011." Dkt. No. 120 at 3. The *49 amended schedule provides that the claim was of "unknown" value. Dkt. No. 120 at 3. At the same time, Debtors also amended their schedule C to claim 100% of the value of the products liability claim exempt under Idaho Code § 11-604(1)(c). Dkt. No. 120 at 5. On April 28, Trustee objected to Debtors' claim of exemption. Dkt. No. 122.
Mr. Bolton submitted to a Rule 2004 Examination in August, 2017. During the exam, he testified that he needed the hip revision surgery because "the disc that went up above the ball ... was shifting ... [and] it was no longer attached." Morrison Decl., Dkt. 149-5 at 28:16-29:5. He also testified that his original hip replacement surgery in 2007 solved the pain he was having prior to the surgery. Dkt. No. 149-5 at 27:17-19. He recalled that it was sometime after he fell "in the early spring or late [sic] of 2010" that he started noticing that when he walked, his hip "started to hurt worse than it used to." Dkt. No. 149-5 at 29:9-24.
Analysis and Disposition
The Court must decide whether Debtors' products liability claim against the hip replacement device manufacturer is property of the bankruptcy estate under § 541(a)(1) because it was a "legal or equitable interest[ ] of the debtor in property as of the commencement of the [bankruptcy] case ... wherever located and by whomever held[.]"[4]
"Under the Bankruptcy Code, the filing of a bankruptcy petition creates a bankruptcy estate." Gladstone v. U.S. Bancorp , 811 F.3d 1133, 1139 (9th Cir. 2016) ; § 541(a). "Property of the bankruptcy estate 'includes nine-non-exclusive subcategories of property,' stated in subsections (a)(1)-(a)(9) of § 541." Porrett v. Hillen (In re Porrett) , 564 B.R. 57, 66 (Bankr. D. Idaho 2016) (citing Samson v. Western Capital Partners, LLC (In re Blixseth) , 684 F.3d 865, 871 (9th Cir. 2012) ). "The legislative history of the Bankruptcy Code reveals the concept of property of the estate to be interpreted broadly." Gladstone , 811 F.3d at 1139 (quoting Chappel v. Proctor (In re Chappel) , 189 B.R. 489, 493 (9th Cir. BAP 1995) ). While § 541(a) defines the scope of the bankruptcy estate, a debtor's "[p]roperty interests are created and defined by state law." Butner v. United States , 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Whether property is included in a bankruptcy estate is a question of law. MacKenzie v. Neidorf (In re Neidorf) , 534 B.R. 369, 371 (9th Cir. BAP 2015).
A. Law re Accrual of Cause of Action
As noted above, under § 541(a)(1), estate property includes all of Debtors' legal or equitable interests in property as of the date they filed their bankruptcy petition. "The reference [in § 541(a)(1) ] to 'as of the commencement of the case' sets a date of cleavage and establishes the moment at which the parties' respective rights in property must be determined." In re Porrett , 564 B.R. at 66 (citations omitted). "Legal causes of action are included within the broad scope of § 541." Goldstein v. Stahl (In re Goldstein) , 526 B.R. 13, 21 (9th Cir. BAP 2015) (citing Sierra Switchboard Co. v. Westinghouse Elec. Corp. , 789 F.2d 705, 707 (9th Cir. 1986) ). See also *50 McGuire v. United States , 550 F.3d 903, 914 (9th Cir. 2008) (citing City & Cty. of San Francisco v. PG & E Corp. , 433 F.3d 1115, 1126 (9th Cir. 2006) ). "This includes prepetition tort causes of action." In re Goldstein , 526 B.R. at 21 (citing Sierra Switchboard , 789 F.2d at 707 ).
Debtors sued the manufacturer of the device used in Mr. Bolton'ship replacement alleging that the product was defective. In this Circuit, for bankruptcy law purposes, a debtor's cause of action for products liability accrues, when "it could have been brought." In re Goldstein , 526 B.R. at 21 (quoting Cusano v. Klein , 264 F.3d 936, 947 (9th Cir. 2001) ).[5] To determine when a cause of action accrues, and therefore whether it arose before the commencement of a bankruptcy case and is estate property, the Court is instructed to consult state law. In re Goldstein , 526 B.R. at 21 (quoting Boland v. Crum (In re Brown) , 363 B.R. 591, 605 (Bankr. D. Mont. 2007) (citing Cusano , 264 F.3d at 947 ) ).
The Idaho Supreme Court[6] has explained that "[w]hether a cause of action is based on warranty, negligence, or strict products liability, plaintiff has the burden of alleging and proving that (1) he was injured by the product; (2) the injury was the result of a defective or unsafe product; and (3) the defect existed when the product left the control of the manufacturer." Farmer v. Int'l Harvester , 97 Idaho 742, 553 P.2d 1306, 1310-11 (I1976) ; Massey v. Conagra Foods, Inc. , 156 Idaho 476, 328 P.3d 456, 460 (2014). Under these requirements, Debtors could not have pursued a products liability claim against the manufacturer (and it would not have accrued for bankruptcy property purposes) until Mr. Bolton was "injured" by the defective hip device.
This conclusion is in line with Idaho statutes concerning the accrual of a personal injury claim. While Idaho Code § 5-219(4) provides that a personal injury cause of action accrues "as of the time of the occurrence, act or omission complained of,"[7] the Idaho Supreme Court has clarified that this statute requires that "there must be 'some damages' before the action begins to accrue." Stuard v. Jorgenson , 150 Idaho 701, 249 P.3d 1156, 1160 (2011) (citing Lapham v. Stewart , 137 Idaho 582, 51 P.3d 396, 400 (2002) ; see also *51 Westfall v. Caterpillar, Inc. , 120 Idaho 918, 821 P.2d 973, 980 (1991) (holding a products liability cause of action accrued when damages were experienced). The court also requires that, for a claim to accrue, such damages must be "objectively ascertainable", meaning that "objective medical proof would support the existence of an actual injury." Stuard , 249 P.3d at 1160 (quoting Davis v. Moran , 112 Idaho 703, 735 P.2d 1014, 1020 (1987) ).
"The date for when a cause of action accrues may be a question of fact or law. However, as here, if no disputed issues of material fact exist, when a cause of action accrues is a question of law for determination by this Court." Reynolds v. Trout Jones Gledhill Fuhrman, P.A. , 154 Idaho 21, 293 P.3d 645, 648 (2013) (citations omitted). Trustee, as "[t]he party seeking to include property in the bankruptcy estate[,] bears the burden of showing that the property in question is property of the bankruptcy estate." In re Porrett , 564 B.R. at 66 (citing In re Neidorf , 534 B.R. at 372 ).
B. When Did Debtors' Cause of Action Accrue?
Based upon the Idaho law discussed above, Debtors' products liability cause of action against the hip device manufacturer could not have accrued until the "objective medical proof" supported the existence of Mr. Bolton's injury and damages. While the parties generally agree about the applicable law, in application, they disagree as to when Mr. Bolton's injury was objectively ascertainable and, thus, when his cause of action against the manufacturer accrued. Trustee argues that, based on these facts, Debtors' claim against the manufacturer was objectively ascertainable, at the latest, two months prior to the commencement of the bankruptcy case in July 2009. Debtors argue that their cause of action was not objectively ascertainable until, at the earliest, Mr. Bolton's November 2009 visit with Dr. Wright, some four months after the petition date.
There is some evidence that Mr. Bolton's injury from his hip replacement was objectively ascertainable prepetition. Dr. Wright's notes from the November 2010 visit, approximately three years after his original surgery, provide Mr. Bolton had experienced pain ever since his October 2007 surgery. The operative report from the January 2011 revision surgery also reflects that Mr. Bolton had persistent pain following the original surgery.
However, Dr. Wright's notes from Mr. Bolton's after-surgery follow-up visits in late-2007 and early-2008 indicate that his original hip replacement had progressed well during that time. The x-rays from November 2007 and January 2008 showed the prosthesis was positioned well. Furthermore, both Dr. Wright and Mr. Bolton opined that all was "going well" through the April 2008 appointment.
The Court is persuaded that, under Idaho law, Mr. Bolton did not experience an "injury" as a result of the implantation of defective hip device prior to April 2008. The late-2007 and early-2008 office notes reflected Mr. Bolton's progress to that point, and the Dr. Wright's general notes written in 2010 and 2011 do little to persuade the Court that the 2007 and 2008 notes were inaccurate.
Trustee founds his position that Debtors' product liability claim against the manufacturer accrued prebankruptcy on Dr. Wright's notes documenting Mr. Bolton's November 2009 visit. They reflect that Mr. Bolton told the doctor that he had hip pain which had progressively gotten worse in the prior six months. Trustee interprets Mr. Bolton's comments to his doctor to mean that, because his hip pain *52 began six months before his November 2009 doctor visit (ergo , before the July 2009 bankruptcy filing), the products liability claims was estate property.
The Court declines to endorse Trustee's logic. The notes from the November 2009 office visit may be insightful because they were prepared near the time of the bankruptcy filing, and because they first document Mr. Bolton's complaints about his hip. But even so, simply because Mr. Bolton's hip pain began six months prior to the visit is not enough to show his injury from the defective hip device was "objectively ascertainable" on bankruptcy day. To the Court, the doctor's notes and other information from that time are, at best, equivocal on this important point. For example, Dr. Wright indicates in the notes that "the cup may be loose." (emphasis added). Dr. Wright notes that x-rays performed at that time showed only "a small radiolucency," which, based upon his nondescript knowledge of the history of the type of implanted device, "may represent loosening." (emphasis added). More precisely, the imaging reports included multiple views that showed there"may be lucency" but that there was "[n]o evidence of migration." While the objective medical evidence in November 2009 certainly allowed Dr. Wright to assume, based on his subjective knowledge, that there was a problem with Mr. Bolton's repaired hip, the objective evidence at that time was inconclusive to show that Mr. Bolton had experienced an "injury" more than four months prior, when Debtors filed their bankruptcy petition.
Because Trustee has not shown that Mr. Bolton's injury was objectively ascertainable on the petition date, the Court will not conclude that Debtor's products liability cause of action was property of the estate under § 541(a)(1).
C. "Sufficiently Rooted in the Prebankruptcy Past"
Although Trustee can not show that Debtors' products liability cause of action accrued prepetition, he argues that it is nonetheless property of the estate because it was "sufficiently rooted in the prebankruptcy past." Debtors disagree.
1. Segal v. Rochelle
In Segal v. Rochelle , 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), the Supreme Court concluded that, under § 70a(5) of the Bankruptcy Act, a loss-carryback tax refund was property of the bankruptcy estate, even though it was received by the debtor after the filing of the bankruptcy petition. The court explained that, under the Act, "it was impossible to give a categorical definition to the word 'property,' " and that the Act's "own purposes must govern." Segal , 382 U.S. at 379, 86 S.Ct. 511. Because the "main thrust of § 70a(5) [was] to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition ... 'property' ha[d] been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." Id. (citations omitted). However, the court tempered these observations by noting that "limitations on the term ['property'] do grow out of other purposes of the Act" such as leaving "the bankrupt free after the date of his petition to accumulate new wealth in the future." Considering these competing policies of the Act, the court concluded a loss-carryback refund received after the bankruptcy filing was nonetheless "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70a(5)." Id. at 380, 86 S.Ct. 511. It supported *53 this conclusion by noting that, "[t]emporally, two key elements pointing toward realization of a refund existed at the time these bankruptcy petitions were filed: taxes had been paid on net income within the past three years, and the year of bankruptcy at that point exhibited a net operating loss." Id.
2. Impact of Enactment of the Code
As the legislative history of § 541(a)(1) explains, the result in Segal , an Act case, survived enactment of the Code. See S. Rep. 95-989, 82, 1978 U.S.C.C.A.N. 5787, 5868 (observing that "[t]he result of Segal v. Rochelle , 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) is followed [under the Code], and the right to a refund is property of the estate.") The Ninth Circuit recognized this in In re Ryerson , 739 F.2d 1423 (9th Cir. 1984) ; see also In re Feiler , 218 F.3d 948, 955-56 (9th Cir. 2000). There, the court explained that the "Code follows Segal insofar as it includes after-acquired property 'sufficiently rooted in the prebankruptcy past' but eliminates the requirement that it not be entangled with the debtor's ability to make a fresh start." Id. (citing S.Rep. No. 989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S. Code Cong. & Ad.News 5787, 5868).[8]
3. Current Status of the "Sufficiently Rooted" Language
As explained above, because Debtors' cause of action accrued[9] postpetition, it was not included as property of the bankruptcy estate under any of the provisions of § 541(a). Even so, the Court must determine whether, under Segal's "sufficiently rooted" rubric, Debtors' claim against the manufacturer had the necessary factual ties to prepetition events to constitute it as property of the bankruptcy estate.
As near as the Court can determine, there is no published Ninth Circuit case law addressing this precise issue. The parties rely on recent decisions from bankruptcy courts from other circuits. Debtors' Br. at 3, Dkt. No. 150 (citing Sikirica v. Harber (In re Harber ), 553 B.R. 522, 533 (Bankr. W.D. Pa. 2016) (holding a products liability claim against a replacement hip manufacturer was not "sufficiently rooted" in the prebankruptcy past); In re Wagner , 530 B.R. 695, 701 (Bankr. E.D. Wis. 2015) (concluding that, in the case of injuries that are potential but not certain, the discovery rule under Wisconsin law is fairer and more predictable than the "sufficiently rooted" test); Tr.'s Resp., Dkt. No. 151 at 2-4 (citing same cases). See also In re Purcell , 573 B.R. 859 (Bankr. D. Kan. 2017) (holding that proceeds from a personal injury settlement were not property of the estate because debtor's claim did not exist prepetition). However, other Ninth Circuit cases persuade the Court to conclude that a cause of action that accrues after bankruptcy cannot be "sufficiently rooted in the prebankruptcy past."
*54 Recall, it was in In re Ryerson , that the Ninth Circuit held the "sufficiently rooted" language survived enactment of the Code. There, an agreement provided that in the event of the termination of the debtor's employment as a district manager for Farmers Insurance Group, he would be paid his "contract value." In re Ryerson , 739 F.2d at 1424. Some nine months after filing his bankruptcy petition, the debtor's employment was terminated, and the contract value was determined to be approximately $19,000. Id. The court held that the debtor's interest "in the 'contract value,' albeit contingent at the time of filing and not payable until such time as his [employment] is terminated or cancelled, is includable within the bankruptcy estate pursuant to section § 541(a)(1)." Id. at 1425. This was because, under the debtor's appointment agreement, the contract had value after debtor completed his first year of service, and at the time he filed his bankruptcy petition, he had completed four years of service. Id. Relying on § 541(a)(6), the Ninth Circuit concluded that "any payments paid upon termination of [debtor's] appointment are also property of the bankruptcy estate although paid after the commencement of the case, at least to the extent the payments are related to prebankruptcy services." Id. Importantly, after explaining that the Code follows Segal insofar as it includes after-acquired property "sufficiently rooted in the prebankruptcy past," the Ninth Circuit explained it was only the value of the contract for the years of service completed prior to bankruptcy that were "sufficiently rooted in the prebankruptcy past." Id. at 1426.
In comparison, in In re Schmitz , about nineteen months after the debtor, a fisherman, filed a chapter 7 petition, government regulations were published implementing a fish management plan that allowed fishermen to be awarded a "quota", that is, an annual catch limit applicable to future fishing, based on the total weight of the fisherman's catch of certain fish during "qualifying years." 270 F.3d 1254, 1255-58 (9th Cir. 2001). Over four and a half years postbankruptcy, the debtor was issued approximately $50,000 worth of quota certificates based on his catches in the years before bankruptcy. Id. at 1256. When the trustee in the bankruptcy case sought a declaratory judgment that the debtor's certificates were property of the estate, the bankruptcy court ruled that, though the government regulations were not adopted until after the bankruptcy petition was filed, the quota certificates were based entirely on the results of the debtor's fishing before bankruptcy. Id. The Ninth Circuit reversed the bankruptcy court, explaining:
On the date that [the debtor] filed his petition, he might have had a hope, a wish and a prayer that the Secretary would eventually implement the plan then under consideration. However, the fact remains that as of the date of the petition, [the debtor's] catch history had no value. At most, there existed the possibility that his prior catch record might be relevant if a fishing quota program were ever adopted in a form favorable to him if his application for such rights were granted, and if he could successfully defend against any competing challenge to his application. This sort of nebulous possibility is not property.
Id. at 1257 (emphasis in original).
While the court did not specifically discuss Segal , it explicitly distinguished Ryerson , explaining that the quota certificates were not payments for the debtor's pre-filing *55 fishing, nor were they a form of deferred compensation received after filing the petition for work performed before filing. Id. at 1258. The Ninth Circuit explained that Ryerson and other cases it cited "all involved payments pursuant to binding pre-existing contracts with well-defined contingency provisions." Id.
4. Debtor's Cause of Action is Not "Sufficiently Rooted in the Prebankruptcy Past"
Under the analysis developed in Ryerson and Schmitz , the Court concludes that, in order for property acquired post-petition to be "sufficiently rooted in the prebankruptcy past," it must arise from some prepetition right or entitlement.[10] In Schmitz , that the debtor had fished before bankruptcy was of no value until the quota regulations were enacted postpetition. In contrast, in Ryerson , although the debtor's right to recover the contract value was contingent on termination of his employment, the debtor was entitled to that contract value because he had worked the minimum number of years required under the contract before bankruptcy.[11] See also In re Goldstein , 526 B.R. at 23 (distinguishing Schmitz because the regulations in Schmitz created new rights postpetition).
In this case, similar to Schmitz , though Mr. Bolton had the manufacturer's product implanted in his hip before bankruptcy, that event was of no value to Debtors as of the date they filed their bankruptcy petition. As explained above, Debtors' cause of action against the hip device manufacturer would not arise until that device resulted in an injury to Mr. Bolton that was objectively ascertainable. On bankruptcy day, it remained a "nebulous possibility" that the device would cause him injury. Put another way, Debtors' cause of action against the manufacturer was not "sufficiently rooted in the prebankruptcy past" so as to constitute property of the bankruptcy estate. Schmitz , 270 F.3d at 1257.[12]
Conclusion
Debtors' cause of action against the hip device manufacturer is not property of the estate. As a result, Trustee's objection to Debtors' claim of exemption is rendered moot, and will be denied in a separate order.

Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 -1532 and all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 -9037.

By amending their bankruptcy schedules to list the products liability claim and exemption, Debtors arguably admitted that it is property of the estate. However, their response to Trustee's objection to the exemption claim indicates these amendments were made "out of caution", and that they believed that the products liability claim was not property of the estate because it arose postpetition. See Dkt. No. 133 at 2. Trustee has not argued that judicial estoppel applies here, and the Court expresses no opinion on that topic.

The action was filed in New Jersey. A Judicial Panel on Multidistrict Litigation had previously ordered, pursuant to 28 U.S.C. § 1407, that litigation against the manufacturer associated with that particular product be centralized in that district. See In re: Zimmer Durom Hip Cup Prods. Liab. Litig. , 717 F.Supp.2d 1376 (U.S. Jud. Pan. Mult. Lit. 2010).

As noted above, the Court is informed by the parties that an offer has been made by the manufacturer to settle the products liability claim, but that offer has not been accepted by Trustee and no settlement money has been received. Had that occurred, the issue for the Court would have been whether the settlement proceeds, as compared to the claim against the manufacturer, would constitute estate property. See § 541(a)(6) (providing that property of the estate includes "[p]roceeds ... of or from property of the estate."

In Cusano , the Ninth Circuit cited to In re Swift when explaining there is a difference between principles of accrual for bankruptcy property purposes and for purposes of deciding when a cause of action was discovered or a statute of limitations was tolled. 264 F.3d at 947. In Swift , the Fifth Circuit explained that, in bankruptcy:
The accrual of a cause of action is a concept closely tied to the fundamental purpose of a cause of action-to make an injured party whole. Damages, then, are a prerequisite to a cause of action. Without damages, there is no injury to remedy.
State Farm Life Ins. Co. v. Swift (In re Swift ), 129 F.3d 792, 796 (5th Cir. 1997) (citations omitted).

Debtors argue New Jersey law should apply, apparently because the products liability action against the manufacturer is pending there. But the Judicial Panel for Multi District Litigation assigned Debtors' suit to the Court only for "coordinated and consolidated pretrial proceedings." See In re: Zimmer Durom Hip Cup Prods. Liab. Litig. , 717 F.Supp.2d 1376, 1378 (U.S. Jud. Pan. Mult. Lit. 2010). Moreover, Debtors alleged that jurisdiction and venue in this action was proper in Idaho because Debtors reside here and that was where the implantation and revision surgeries occurred. Compl. at 2, Dkt. No. 157-1. The Court will apply Idaho law to resolve the issues in this case.

Idaho Code § 6-1403 is the statute of limitation applicable to products liability claims; it incorporates § 5-219 to determine when such a claim accrues.

At least one other Circuit has held that "although Congress has specifically approved of Segal's result, [its] 'sufficiently rooted' test did not survive enactment of the Bankruptcy Code." Burgess v. Sikes (In re Burgess) , 438 F.3d 493, 498-99 (5th Cir. 2006). The Fifth Circuit explained:
"Section 541 now governs what is considered property of the estate, and unlike former § 70a(5) of the Bankruptcy Act, § 541 expressly defines property ... [and] under current law, a debtor's interest in property may be contingent-or enjoyment of the interest may be postponed-until after bankruptcy, but the debtor must have had a prepetition legal interest nonetheless.
Id.

Again, in the Ninth Circuit, "accrual" for these purposes refers to when a claim against another could have been brought by the debtor, something that may be separate and distinct from when that claim accrued for purposes of a statutes of limitation.

The Ninth Circuit BAP came to this same conclusion in an unpublished decision. In re Bender , 385 B.R. 800, 2007 WL 4896288, *4 (9th Cir. BAP 2007), appeal dismissed , 586 F.3d 1159 (9th Cir. 2009) (stating "[the Ninth Circuit] has limited its use of Segal to situations where a debtor received a post-petition benefit pursuant to a pre-petition right or entitlement.").

Notably, in Ryerson , only that portion of the contract value that was attributable to debtor's prebankruptcy services was held to be property of the estate.

The Court acknowledges that the Ninth Circuit, in two unpublished decisions, has employed language suggesting that a claim that accrues postpetition may be "sufficiently rooted in the prebankruptcy past." See Leroux v. CPA Ins. Co. , 720 Fed.Appx. 832, ----, 2017 WL 6547490, *1 (9th Cir. 2017) ; Martinez v. Lincoln General Ins. Co. , 417 Fed.Appx. 711, 712-13 (9th Cir. 2011). Those decisions are not precedent, and their brief accounts of the facts and sparse analysis do not persuade the Court to depart from the reasoning in Schmitz.